Lilia Angeles and Gerardo ANGELES, Appellants,

v.

**BROWNSVILLE VALLEY REGIONAL MEDICAL CENTER, INC. and Pedro B. De La Vega, M.D., Appellees.**

No. 13–95–492–CV.

Court of Appeals of Texas, Corpus Christi.

Nov. 20, 1997.

Rehearing Overruled Dec. 18, 1997.

---

Roy S. Dale, Kathryn M. Flagg, Dale & Klein, McAllen, for appellants.

Robert L. Guerra, Thornton, Summers, Biechlin & Dunham, McAllen, Linda C. Breck, Thomas F. Nye, Douglas M. Kennedy, Brin & Brin, Corpus Christi, William Gualt, Brin & Brin, Brownsville, Amado Rob-

ledo, McAllen, Stephanie S. Bascon, McCue & Lee, Dallas, for appellees.

Before DORSEY, CHAVEZ and RODRIGUEZ, JJ.

## OPINION

DORSEY, Justice.

Gerardo and Lilia Angeles sued Brownsville–Valley Regional Medical Center, Inc., and Pedro B. De La Vega, M.D., appellees, asserting numerous claims for appellees' failure to dispose of Lilia's stillborn fetus in a respectful way. Appellees filed a counterclaim against them, seeking attorneys fees for defending the suit. The court granted summary judgment favorable to appellees on the DTPA[1] and contract claims, and the remaining causes of action went to trial. After a jury trial, the court entered a judgment that the Angeleses recover nothing on their remaining claims and awarded appellees attorneys fees for defending the suit. The Angeleses bring nine points of error for our consideration. We affirm in part and reverse in part.

### The Allegations

Lilia and Gerardo Angeles pleaded the following: About August 20, 1992, Lilia was admitted to Brownsville–Valley Regional Medical Center (the Hospital) where she gave birth to a stillborn fetus. The Angeleses had agreed to have an autopsy performed on the fetus. On August 24, 1992, the Angeleses contacted Dr. Pedro B. De La Vega, M.D., the pathologist at the Hospital. They discussed taking possession of the body for a funeral and burial. However, Dr. De La Vega said that the autopsy was not yet performed. He also stated to either Lilia or Gerardo that a funeral and burial would be expensive, and he offered to dispose of the fetus in a respectful manner. The Angeleses agreed that he do so. About three months later, the Angeleses learned that no one had disposed of the fetus. Instead, Dr. De La Vega, the Hospital's employees, or both had preserved it in a plastic-type container at the Hospital. Neither Dr. De La Vega nor any other Hospital employee or representative had contacted the Angeleses after August 24, 1992 to inform them that: (1) no one had disposed of the fetus in a proper manner; (2) that they could take possession of the fetus; or (3) that the Hospital had stored the fetus in an improper, illegal, and/or disrespectful manner. When the Angeleses discovered that the Hospital had stored the fetus, they obtained it and held a funeral service and burial.

The Angeleses alleged that they sought from the Hospital the facilities for the birth of children, including the handling of stillborns in a respectful manner. They sought from Dr. De La Vega the autopsy and the accompanying proper handling of the fetus in a proper and respectful manner. They alleged that Dr. De La Vega and the Hospital violated Sections 17.46(b)(5), (7), (9), (12), & (23) of the DTPA. They further alleged that appellees' conduct constituted an unconscionable action or course of action. Alternatively, they alleged that appellees' conduct and representations with regard to their promise or representation that they would dispose of the fetus in a respectful manner constituted an implied and/or oral contract which appellees breached. They further alleged claims for negligence, gross negligence, and negligent and intentional infliction of emotional distress. They sought punitive damages and damages for mental anguish and funeral expenses.

### The Summary Judgment

Dr. De La Vega and the Hospital filed separate summary judgment motions. Regarding DTPA, the Hospital moved for summary judgment on the grounds that it made no misrepresentations to the Angeleses, the Angeleses were not consumers, and the Medical Liability & Insurance Improvement Act barred the claim. Dr. De La Vega's motion asserted the Hospital's latter two grounds for summary judgment on the DTPA claim. He further asserted that he did not make any knowing misrepresentations, nor did he make any express or implied warranties.

---

1. *See* Tex. Bus. & Com.Code Ann. §§ 17.01–17.854 (Vernon 1987 & Supp.1997).

Regarding the contract claim, Dr. De La Vega's summary judgment motion asserted three grounds as a bar to this claim: (1) no consideration; (2) a lack of definiteness about the contract; and (3) the statute of frauds. The Hospital asserted that no one having its authority made any contract with the Angeleses.

The trial court granted summary judgment[2] favorable to appellees on the DTPA and breach-of-contract claims. Summary judgment for a defendant is proper only when the defendant negates at least one element of each of the plaintiff's theories of recovery, *The Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997), or pleads and conclusively establishes each element of an affirmative defense. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference in the nonmovant's favor. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 549 (Tex. 1985).

By point three, the Angeleses assert the trial court erred when it granted summary judgment because Dr. De La Vega's affidavit offered to support his motion constituted inadequate summary judgment evidence.

Our summary judgment rule permits the granting of a summary judgment on the basis of uncontroverted testimonial evidence of an interested witness if that evidence "is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." TEX.R. CIV. P. 166a(c). The supreme court has stated that the phrase "could have been readily controverted" means that the testimony at issue is of a nature which can be effectively countered by opposing evidence. *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex. 1989).

Among other declarations, Dr. De La Vega's affidavit included these statements in support of his summary judgment motion:

(1) he did not contract with the Angeleses, nor make any representations to them that he would bury or otherwise dispose of the fetus; (2) the Angeleses gave him no consideration; and (3) there was no charge for holding the fetus until the time they determined what action they would take. This testimony is of a nature which the Angeleses could have effectively countered by opposing evidence. The affidavit otherwise complies with Rule 166a(c). We hold that the trial court did not err by considering this affidavit to grant summary judgment for Dr. De La Vega. We overrule point three.

By point two, the Angeleses assert that the trial court erred when it granted summary judgment favorable to appellees on their DTPA claim. The Hospital's and Dr. De La Vega's summary judgment evidence included the Angeleses' deposition excerpts. Dr. De La Vega's summary judgment evidence also included his affidavit. His affidavit stated, in relevant part:

> On the same day that I conducted the autopsy, I was contacted by Mrs. Lilia Angeles inquiring about the fetus. I informed Mrs. Angeles that the family had two options: 1) they could provide the name of a funeral home and have the fetus buried at their expense, or 2) Valley Regional could dispose of the fetus after the appropriate consents were signed. I informed Mrs. Angeles that if they chose the second option, there would not be an expense to the family....

Dr. De La Vega further declared that he did not contract with the Angeleses, nor did he make any representations to them that he would bury or dispose of the fetus. He did not discuss any specifics regarding the disposal of the fetus with the Angeleses. The Angeleses gave no consideration to him. Because the Angeleses could not decide how to proceed with the fetus, he directed the lab personnel to preserve the fetus in a sealed, plastic container. There was no charge for holding the fetus.

---

**2.** The trial court denied appellees' motions to sever that part of the suit from the remainder of the suit.

Lilia Angeles's deposition testimony[3] showed that the Angeleses did not pay Dr. De La Vega or the Hospital for disposal of their child's body.

■ The DTPA defines a consumer as one "who seeks or acquires by purchase or lease, any goods or services." TEX. BUS. & COM. CODE ANN. § 17.45(4) (Vernon 1987). In determining whether a plaintiff is a consumer, our focus is on the plaintiff's relationship to the transaction. *Amstadt v. United States Brass Corp.,* 919 S.W.2d 644, 650 (Tex.1996). In *Kennedy v. Sale,* 689 S.W.2d 890 (Tex. 1985), the supreme court held that the DTPA does not require the consumer to act as the actual purchaser or lessor of the goods or services, as long as the consumer is the beneficiary of those goods or services. *Kennedy,* 689 S.W.2d at 892.

■ In the instant case, the Angeleses did not pay the Hospital or Dr. De La Vega for disposal of the fetus, and there was no charge for holding the fetus. Further, the Angeleses did not allege that a third party had paid the Hospital or Dr. De La Vega for this service on their behalf. Since the Angeleses did not purchase or lease the service of disposing the fetus, they did not qualify as consumers. *See* TEX. BUS. & COM.CODE ANN. § 17.45(4) (Vernon 1987); *Kennedy,* 689 S.W.2d at 892.

The Angeleses would ordinarily be considered consumers of medical services provided by the hospital, both maternity and obstetric care. Because the child was stillborn, the promise to provide burial arrangements could be said to be based on, or flow from, the initial purchase of medical services and is closely associated with such services. However, the supplying of medical services is expressly exempted from the application and remedies of the DTPA. TEX.REV.CIV. STAT. ANN. art. 4590i, § 12.01(a) (Vernon Supp. 1997). For purposes of the DTPA, the Angeleses are not consumers of medical services, and therefore, cannot be held to be consumers of incidental services, unless those services were purchased or leased apart from the initial purchase of medical services.

■ Based upon the summary judgment evidence, Dr. De La Vega gave the Angeleses the option to allow the Hospital to dispose of their child's body. The Angeleses did not have to pay for this service. A service performed gratuitously is not a "purchased" service within the meaning of the DTPA. *Fortner v. Fannin Bank,* 634 S.W.2d 74, 76 (Tex.App.—Austin 1982, no writ). We hold that the trial court did not err by granting summary judgment to the appellees on the Angeleses' DTPA claim. We overrule point two.

■ By point one, the Angeleses assert that the trial court erred when it granted summary judgment favorable to appellees on their breach-of-contract claim. A binding contract must have an offer and an acceptance, and the offer must be accepted in strict compliance with its terms. The parties must have a meeting of the minds, and each must communicate his consent to the terms of the agreement. Consideration is a fundamental element of every valid contract; it can consist of a benefit to the promisor or a loss or detriment to the promisee. *Smith v. Renz,* 840 S.W.2d 702, 704 (Tex.App.—Corpus Christi 1992, writ denied); *Garcia v. Villarreal,* 478 S.W.2d 830, 832 (Tex.Civ. App.—Corpus Christi 1971, no writ).

■ An implied contract arises from the dealings of the parties, from which the facts show that the minds of the parties met on the terms of the contract without any legally expressed agreement thereto. *Smith,* 840 S.W.2d at 704; *McDonald v. Wm Cameron & Co.,* 80 S.W.2d 1065, 1065 (Tex.Civ.App.— Fort Worth 1935, no writ).

■ The summary judgment evidence showed that the Angeleses did not pay the Hospital or Dr. De La Vega for disposal of the fetus. The Hospital and Dr. De La Vega did not receive any benefit, and the Angeleses did not suffer any detriment. Accordingly, no consideration passed between the parties. Without consideration, no contract

---

3. Her deposition testimony was attached to the Hospital's and Dr. De La Vega's summary judgment motions.

existed. *See Smith,* 840 S.W.2d at 704. We hold that the trial court did not err by granting summary judgment favorable to appellees on the Angeleses' contract claim. We overrule point one.

### The Trial

By point four, appellants assert that the trial court erred when it granted directed verdicts on their claims for intentional and negligent infliction of emotional distress because the pleadings and evidence supported these claims. After the Angeleses rested their case, the Hospital's counsel moved for a directed verdict on the Angeleses' claim against appellees for intentional infliction of emotional distress. The trial court granted a directed verdict on that claim.

In reviewing the granting of a directed verdict, we will "determine whether there is any evidence of probative force to raise fact issues on the material questions presented." *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex. 1978). We consider all of the evidence in the light most favorable to the parties against whom the verdict was directed and disregard all contrary evidence and inferences. *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983). If there is any conflicting evidence of probative value on any theory of recovery, a directed verdict is improper, and we must reverse and remand for the jury's determination on the issue. *White,* 651 S.W.2d at 262.

■ To recover for intentional infliction of emotional distress, a plaintiff must prove that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *Twyman v. Twyman,* 855 S.W.2d 619, 621–22 (Tex.1993). In *Twyman,* the court adopted the Restatement's formulation of the tort of intentional infliction of emotional distress, including the definition of extreme and outrageous conduct as conduct that is " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Twyman,*

855 S.W.2d at 621 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). According to the supreme court, "[r]ude behavior does not equate to outrageousness, and behavior is not outrageous simply because it may be tortious." *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994). Even unscrupulous and ignominious behavior does not rise to the level of "extreme and outrageous." *See Miller v. Galveston/Houston Diocese,* 911 S.W.2d 897, 899 (Tex.App.— Amarillo 1995, no writ). Whether we may reasonably regard a defendant's conduct as so extreme and outrageous in order to allow recovery is a question of law. *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993).

■ The evidence showed that on August 24, Lilia Angeles talked to Dr. De La Vega on the telephone. She informed him that she was Baby Angeles's mother and that she wanted to bury her baby. She informed him that when she delivered her baby, Donna Nelson, a nurse, had advised her that due to the baby's weight and length, the law required a burial. She testified that Dr. De La Vega informed her that the baby was decomposed due to the autopsy and that "it was going to be expensive for us to . . . bury our baby, to go through a funeral, . . . they could take care of my baby there in a respectful way, and that they didn't just dispose of the body; that they would do it in a respectful way." When Dr. De La Vega advised her that they would dispose of the baby in a respectful way, she thought they had a special place for babies there, that is, a special place to bury or put babies. She advised him, "I can't decide right now because my husband is at work and I need to discuss it with him and we'll let you know." Lilia testified that after she had discussed the matter with her husband, Gerardo, he called Dr. De La Vega that same day. She heard him advise Dr. De La Vega,

> My wife told me . . . that they would take care of the baby there, and that it was going to be expensive for us to go through a funeral, and that I had told him that the baby's body was decomposed and that I had mentioned something to him, and that we had decided that . . . we were going to

let him take care of the baby, since he had offered to do it.

Gerardo Angeles testified that Dr. De La Vega had informed him that "We don't just dispose of the bodies. We do it in a respectful way." By the term "respectful way," Gerardo thought they would take the baby and put it in the Hospital's chapel, or they would have some place in the Hospital where they would bury the baby.

About November 1992 (roughly three months after speaking to Dr. De La Vega), Lilia found out that her child was still at the Hospital. No Hospital personnel, including Dr. De La Vega, had discussed with her a consent form relating to her child's disposal.

Guadalupe Coronado worked as a histology technician at the Hospital's pathology lab. He stored the Angeleses' fetus in a sealed container of formalin, a preservative. He placed the container on an open rack in the morgue. The container had the Angeleses' name on it, and it was marked "save." The Angeleses' fetus remained in the morgue about three months. After this three-month period, Dr. De La Vega asked Coronado to bring the fetus back to the lab because the family had decided to bury it.

The Angeleses' claim for intentional infliction of emotional distress centers upon whether preserving their fetus in a sealed container and storing it in the Hospital's morgue constituted extreme and outrageous conduct. After considering all of the evidence in the light most favorable to the Angeleses, we conclude that the conduct was not so outrageous in character, and so extreme in degree that it went beyond all possible bounds of decency. It was not atrocious and utterly intolerable in a civilized community. In this case, no one abused the fetus; rather, appellees preserved it. Although the conduct was nonchalant and insensitive, it did not rise to the level of "extreme and outrageous." Since the Angeleses did not establish this element of their claim, they do not have a cause of action for intentional inflictions of emotional distress. *Twyman*, 855 S.W.2d at 621. We hold that the trial court did not err when it granted a directed verdict on the claim for intentional infliction of emotional distress.

Concerning the claim for negligent infliction of emotional distress, the Hospital moved for a directed verdict on this claim. At that time, one of the attorneys stated in open court that the claim had been eliminated at a pretrial conference. The Angeleses' counsel offered no objection to the statement. During that pretrial conference, the Angeleses' counsel admitted that a claim for negligent infliction of emotional distress did not exist. We agree. *See Boyles v. Kerr*, 855 S.W.2d 593, 595–97 (Tex.1993). We overrule point four.

By point seven, the Angeleses assert that the jury's answers to Special Questions One and Five were against the great weight and preponderance of the evidence. In reviewing a challenge that the jury finding is against the great weight and preponderance of the evidence, we must examine the entire record to determine if some evidence exists to support the finding, if the finding is so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and manifestly unjust, or if the great preponderance of the evidence supports its nonexistence. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). If we conclude that the finding or non-finding is against the great weight and preponderance of the evidence, we may reverse and remand the case for a new trial. *Ames v. Ames*, 776 S.W.2d 154, 158 (Tex. 1989); *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex.1988).

Question No. 1 asked, "Did the negligence, if any, of those named below proximately cause the injury in question?" The jury found negligence on behalf of the Angeleses, but it found no negligence on behalf of Dr. De La Vega and the Hospital. The issue here is whether the record contains evidence which would support a jury finding or findings that Dr. De La Vega, the Hospital, or both were negligent in failing to dispose of the fetus in a respectable way.

Dr. De La Vega performed the autopsy on the fetus. He said that the fetus weighed 465 grams. He was aware that the medical

chart showed that it was more than twenty weeks in gestation. Defense counsel asked him:

> [I]f you got the fetus in your laboratory like the Angeles fetus whether it weighs more than 500 grams and/or less than 500 grams and it is more than 20 weeks, and you don't have a funeral home designated, and you do not have a release of body form, based upon medical standards and the way you conducted the lab in 1992, did you have the authority to release that fetus to anyone?

He responded, "If there is not a consent I will not touch it. I will put it in formalin and let it stay there." That is what he did in this case. He said that Lilia Angeles called him, and he explained to her that the fetus could go to the funeral home, or she could use the free service offered by the Hospital. The Hospital could dispose of the fetus in a respectable way. He advised her that "[w]e needed a signed 'permit' for both." She advised him that she needed to discuss the matter with her husband, family, or both and that she would let him know. He did not recall talking to Gerardo Angeles about their decision. After Dr. De La Vega finished the autopsy, he asked Guadalupe Coronado, the histology technician, to contact the Hospital's nursing service. Coronado called labor and delivery, the place where Lilia delivered the fetus. According to Dr. De La Vega, a nurse advised Coronado "to hold the fetus, because the family had not made up their mind." In November 1992, Dr. Martha Martinez called Dr. De La Vega and informed him that the Angeleses had decided to bury their child. From August 1992 to November 1992, he was waiting to get consent to dispose of the fetus, or to receive the name of a funeral home. When the Angeleses' counsel asked him, "It would be against the law to call anybody to tell them that the body is there?" He responded, "You are not supposed to harass people. You cannot call the family, come pick your fetus up because it is the responsibility of the family. We cannot call. Because if you call two or three times, and you have a lawsuit."

Guadalupe Coronado testified that he called the nursing department for the release or the disposal permit because he did not know what funeral home to send the fetus. He could not remember for sure who he had talked to, but he thought he had talked to a nurse named Donna Nelson. The nurse advised him that the parents (the Angeleses) had not decided which funeral home to call, or what they were going to do with their fetus.

Donna Nelson had worked as a registered nurse for the Hospital at the time when Lilia delivered her stillborn fetus. On two occasions she had talked to the Angeleses about the choices they had regarding their fetus. She informed them about having the fetus autopsied, having it buried, and the right to go to a funeral home to make funeral arrangements. She weighed the fetus and said that it weighed 595 grams.

Tamarind Cowen, the Hospital's assistant administrator, testified that she had worked at the Hospital since 1986. Between August and November 1992, she had worked as the Hospital's chief nursing officer, which was the same as director of nurses. She was "over all the nurses, policies and procedures, and the nursing staff" at the Hospital. She testified about a guideline that nurses were supposed to follow. This guideline was in effect during August 1992. It stated:

> A deceased fetus weighing 500 grams or more or whose gestational age is 20 weeks or more measured from the first day of the last menstrual period must be buried. If the dead fetus is less than 500 grams or less than 20 weeks gestational age, the hospital may dispose of the fetus unless the family chooses to bury the infant through personal arrangements. If no burial is desired, the fetus is sent to the pathology with the appropriate labs with completed consent to dispose of the dead fetus in the container.

Allen Wells worked as the Hospital's administrative director of its laboratories. He had served in that capacity since August 1992. The Angeleses' counsel asked him, "[W]hat's … your understanding as it existed back in 1992, once the autopsy was performed—as far as what to do with the body?" He responded that upon completion of the autopsy, "a hospital representative contact[s]

a funeral home." He stated that the next of kin have the burden to let them know what to do with the body. According to Wells, when the lab has a body, he cannot do anything without direction from the next of kin. The Angeleses' counsel asked him, "You don't have any responsibility if the body is there for an excessive period of time to find out what is going on with that body?" He answered in the negative. He stated that because of the fetus's weight and gestational age (twentythree weeks estimated), the Hospital was not able to dispose of the body without the parents' consent. If the Hospital had the parents' consent, due to the fetus's size and nature, it would have had to give the fetus to a funeral home. The funeral home could dispose of the fetus in any way the parents deemed necessary.

Gerardo Angeles testified that he had called Dr. De La Vega and advised him that he and his wife had talked about what to do with their baby. Gerardo's impression, after talking to Dr. De La Vega, was that the Hospital would take care of their baby in a respectful manner.

On cross-examination, Gerardo's testimony showed that on April 21, 1993, he had seen a psychologist. Counsel asked him if he had informed the psychologist "that you avoided asking for disposal of the fetus prior to November because of guilt?" He answered, "Yes, I would say."

Lilia Angeles' testimony showed that soon after she gave birth, Nurse Donna Nelson advised her to "[c]ontact a funeral home." Lilia Angeles testified that she heard her husband inform Dr. De La Vega that "we were going to let him take care of the baby, since he had offered to do it." Her testimony was that she did not know that she had to sign anything.

▪ The jury's province was to weigh and consider all the evidence. The Angeleses' evidence showed that Gerardo had advised Dr. De La Vega to dispose of the fetus in a respectable way. Lilia did not know that she had to sign anything. On the other hand, the appellees' evidence showed that they could do nothing with the fetus without

the Angeleses' consent and that Dr. De La Vega informed Lilia that they needed her to sign a permit. The Hospital kept the fetus because they were waiting to hear from the Angeleses. After examining the record, we conclude that the jury's failure to find negligence on behalf of the Hospital and Dr. De La Vega was not so contrary to the overwhelming weight and preponderance of the evidence that it was clearly wrong and manifestly unjust.

Special Question No. 5 asked whether an agency relationship existed between Dr. De La Vega and the Hospital with respect to the injury in question. The jury answered in the negative. Since we have concluded that the jury's findings with respect to Question No. 1 were not against the great weight and preponderance of the evidence, we need not discuss the evidence supporting the jury's answer to Question No. 5. We overrule the point of error.

By point six, appellants assert that the trial court erred when it excluded evidence relating to Chapter 691, Texas Health & Safety Code.[4] The Angeleses alleged that appellees' conduct in retaining possession of the fetus violated Chapter 691 and, therefore, constituted negligence as a matter of law. During the trial of this case, the Angeleses' counsel tried to interrogate Allen Wells about Chapter 691. The court sustained defense counsel's objection to this evidence. Later, the court again refused to allow this statute to go before the jury.

▪ To obtain reversal of a judgment based upon error of the trial court in admission or exclusion of evidence, the complainant must show: (1) that the trial court did in fact commit error; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989); Tex.R.App. P. 81(b).

▪ Sections 691.001–010 concern the make up and operation of the Texas Anatomical Board (the Board) and do not apply to the facts of this case. *See* Tex. Health &

---

4. *See* Tex. Health & Safety Code Ann. §§ 691.001– 035 (Vernon 1992 & Supp.1997).

SAFETY CODE ANN. §§ 691.001–010 (Vernon 1992).

Sections 691.021–035 concern the distribution, delivery, donation, transportation, and use of bodies. Section 691.023 provides the duties that "[a]n officer, employee, or representative of the state, of a political subdivision, or of an institution having charge or control of a body not claimed for burial or a body required to be buried at public expense." TEX. HEALTH & SAFETY CODE ANN. § 691.023 (Vernon 1992). Section 691.025(c) provides that "[a] body that is not claimed for burial within 48 hours after a relative receives notification shall be delivered as soon as possible to the board or the board's representative." TEX. HEALTH & SAFETY CODE ANN. § 691.025(c) (Vernon 1992). This case does not involve a body not claimed for burial. The Angeleses wanted the fetus disposed of in a respectable way. Appellees were holding the fetus while the Angeleses made their decision. The Hospital could not dispose of the fetus or transfer it to a funeral home *without* the Angeleses' consent. No evidence showed that the fetus was to be buried at public expense. We hold that the trial court did not err when it refused to allow evidence of, or testimony about, Chapter 691.

The Angeleses also complain that the trial court erred in refusing to submit an instruction to the jury regarding Chapter 691. Rule 278, Texas Rules of Civil Procedure, states that the court shall submit the questions, instructions, and definitions which are raised by the written pleadings *and* the evidence. In this case, the evidence did not support the submission of an instruction regarding Chapter 691. We hold that the trial court did not err by refusing to submit an instruction on this issue. We overrule point six.

By point eight, the Angeleses assert that the trial court erred when it admitted the testimony of Tamarind Cowen and Dr. De La Vega regarding the medical negligence standard of care. The complained-of testimony is stated as follows: During trial, defense counsel asked Cowen several questions about standard of care. First, he asked if she was familiar with the standard of care for nurses

and hospitals in Cameron County, Texas. She answered affirmatively. Second, he asked her, "Are you familiar with what they should do in circumstances similar to the Angeles' here?" She answered affirmatively. When counsel posed his next question—"Do you have an opinion as to whether or not—", the Angeleses' counsel objected that this was not a medical malpractice case and that she was not an expert qualified in these fields. The court overruled the objection, and counsel asked, "Do you have an opinion as to whether or not ... [the Hospital] met the standard of care?" She testified that the Hospital met the standard of nursing care for "this patient." Next, counsel asked her if she thought the Hospital was negligent in this case. The Angeleses' counsel objected, but the court did not rule on the objection; rather, it asked counsel to rephrase the question. Counsel asked her if the Hospital met the standard of care. She answered affirmatively.

The only testimony arguably preserved is Cowen's testimony relating to the nursing standard of care. The Angeleses objected to that testimony on the grounds that she was not an expert and that this was not a medical malpractice case. Whether a witness is qualified to offer expert testimony is a matter committed to the trial court's discretion. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex.1996). The trial court must determine if the putative expert has "knowledge, skill, experience, training, or education" that would "assist the trier of fact." *United Blood Servs. v. Longoria*, 938 S.W.2d 29, 30–31 (Tex.1997) (per curiam). *See* TEX.R. CIV. EVID. 702. The offering party has the burden of establishing an expert's qualifications. *Broders*, 924 S.W.2d at 151. We gauge abuse of discretion by whether the trial court acted without reference to any guiding rules or principles. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex.1995).

In this case, the court did not clearly abuse its discretion when it allowed Cowen to testify about whether the Hospital met the nursing standard of care. Cowen had worked as the Hospital's chief nursing officer. She was "over all the nurses, policies

and procedures, and the nursing staff" at the Hospital. The trial court could have determined from her job experiences that she was familiar with the nursing standard of care.

■ Concerning the objection that this case is not a malpractice case, the standard of review in determining whether a trial court erred in an evidentiary ruling is abuse of discretion. *Jackson v. Van Winkle,* 660 S.W.2d 807, 810 (Tex.1983). This case involves the proper procedures that a hospital and its staff employ to care for a stillborn fetus. The court and jury must be guided by expert testimony to explain these procedures. There was substantial testimony relating to whether the Hospital, its staff, and Dr. De La Vega followed various policies and guidelines. Accordingly, the court did not abuse its discretion when it admitted Cowen's testimony.

■ Regarding Dr. De La Vega's testimony, defense counsel asked Dr. De La Vega whether, as a medical doctor, he had a different standard of care than the nurses that worked at the Hospital. The Angeleses' counsel objected on the basis that "[w]e are not talking about standards of care ... in this case...." The court overruled the objection, and Dr. De La Vega answered affirmatively. His testimony showed that he had more discretion in handling human remains than a nurse. As a physician, Dr. De La Vega can testify about whether his conduct in handling the fetus was different than the way the nurses had to handle the fetus. The trial court did not abuse its discretion in admitting this testimony. We overrule point eight.

### The Counterclaim

By point nine, the Angeleses attack the legal and factual sufficiency of the evidence to support the trial court's award of sanctions and attorneys fees against them. After the jury rendered its verdict, the court heard appellees' counterclaim based upon Section 17.50(c), Texas Business & Commerce Code and Section 9.001–014, Texas Civil Practice & Remedies Code. It also heard appellees' motion for sanctions pursuant to Rule 13, Texas Rules of Civil Procedure. After a bench trial, the court rendered judgment on appellees' counterclaim. It found that the Angeleses' claims brought under the DTPA along with their claims for negligence, intentional infliction of emotional distress, and breach of contract were groundless and brought in bad faith. The court found that the Angeleses did not make a good-faith argument for the extension, modification, or reversal of existing law. The court determined that good cause existed for an award of attorneys fees. The court awarded $25,000 and $20,000 in attorneys fees to the Hospital and Dr. De La Vega, respectively. It awarded each appellee additional attorneys fees conditional on appeal.

■ Section 17.50(c) provides that "[o]n a finding by the court that an action under this section was groundless in fact or law or brought in bad faith, or brought for the purpose of harassment, the court shall award to the defendant reasonable and necessary attorneys' fees and court costs." TEX. BUS. & COM.CODE ANN. § 17.50(c) (Vernon Supp. 1997). "Groundless" under the DTPA has the same meaning as "groundless" under Rule 13: "[N]o basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." TEX.R. CIV. P. 13; *Donwerth v. Preston II Chrysler–Dodge, Inc.,* 775 S.W.2d 634, 637 (Tex.1989). The proper standard for determining whether a case is groundless for purposes of Section 17.50(c) is whether the totality of the tendered evidence demonstrates an arguable basis in fact and law for the consumer's claim. *Splettstosser v. Myer,* 779 S.W.2d 806, 808 (Tex.1989); *Donwerth,* 775 S.W.2d at 637.

Section 9.011 provides:

The signing of a pleading as required by the Texas Rules of Civil Procedure constitutes a certificate by the signatory that to the signatory's best knowledge, information, and belief, formed after reasonable inquiry, the pleading is not:

(1) groundless and brought in bad faith;

(2) groundless and brought for the purpose of harassment; or

(3) groundless and interposed for any improper purpose, such as to cause unnec-

**866**

essary delay or needless increase in the cost of litigation.

TEX. CIV. PRAC. & REM.CODE ANN. § 9.011 (Vernon Supp.1997). Section 9.001(3) defines "groundless" as no basis in fact or not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law. TEX. CIV. PRAC. & REM.CODE ANN. § 9.001(3) (Vernon Supp. 1997).

Appellate review of a trial court determination that a party's action was groundless, brought in bad faith, or brought for the purpose of harassment is a question of law under an abuse of discretion standard. *Donwerth,* 775 S.W.2d at 637 n. 3. An appellate court should set aside the trial court's ruling only if, after reviewing the entire record, it is clear that the trial court abused its discretion. *See Simon v. York Crane & Rigging Co.,* 739 S.W.2d 793, 795 (Tex.1987). An abuse of discretion occurs when a court acts without reference to guiding rules or principles, or acts arbitrarily or unreasonably. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241 (Tex.1985).

We do not believe that the Angeleses' suit was so outside the pale of the law that it could be considered groundless for purposes of the DTPA, Rule 13, or Section 9.011 and, therefore, sanctionable. The evidence showed that Gerardo had instructed Dr. De La Vega to dispose of the fetus. Lilia was not aware that she had to sign anything. Dr. De La Vega had advised them that he could dispose of the fetus in a respectable way, free of charge. Instead, he preserved the fetus in a container and stored it in the morgue. Appellees did not inform the Angeleses that the fetus was stored in the morgue.[5] And the Angeleses did not discover this problem for three months after Lilia gave birth. Although their suit failed, we believe it was a good-faith contention for the extension, modification, or reversal of existing law. The suit was not, therefore, groundless or sanctionable under the DTPA, Rule 13, or Section 9.011..

We hold that the trial court abused its discretion in awarding sanctions, and we sustain the Angeleses' ninth point of error.

Due to our disposition of the above points, we need not address the remaining point. TEX.R.APP. P. 90(a).

We REVERSE the portion of the trial court's judgment awarding sanctions against appellants. Otherwise, the judgment of the trial court is AFFIRMED.

---

5. Had the Hospital or its counsel sent the Angeleses a reminder that the fetus was stored in the morgue, the litigants could have possibly avoided this suit.