

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00030-CV

_____

PROGRESSIVE TRANSPORTATION, LLC, Appellant

V.

REPUBLIC NATIONAL INDUSTRIES OF TEXAS, LP, AND
REPUBLIC CORPORATION, Appellees

On Appeal from the County Court at Law
Harrison County, Texas
Trial Court No. 2013-9369

Before Morriss, C.J., Moseley and Carter*, JJ.
Memorandum Opinion by Chief Justice Morriss

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

# MEMORANDUM OPINION

Much is murky in this collection dispute between Progressive Transportation, LLC, and Republic National Industries of Texas, LP (Republic).[1]  What is clear, however, resulted in a summary judgment that Progressive take nothing in its suit against Republic and that Progressive owed Republic overpayments and attorney fees.  We modify the judgment to strike Republic's recovery of attorney fees from Progressive; and, as modified, the judgment is affirmed both as to the denial of Progressive's claims against Republic and the recovery by Republic from Progressive on its non-attorney-fee claims.  We reach that result because, as a matter of law, (1) denying Progressive's claims was proper, (2) awarding Republic recovery on its overpayments was proper, and (3) Republic was not entitled to recover attorney fees.

Pursuant to an assignment of accounts from freight carrier BMB Logistics, Inc., Progressive billed Republic for freight services that Progressive alleged were provided by BMB to Republic.  Republic paid several invoices before concluding that Progressive was billing for work that was actually completed by another freight carrier, Tenco Transportation, Inc., which had not assigned any accounts to Progressive.  After Republic refused to pay additional invoices, Progressive filed a suit on sworn account for the unpaid invoices and claims for breach of contract and quantum meruit.  In response, Republic filed a counterclaim for money had and received, arguing that it was entitled to reimbursement for payments made on the initial invoices

---

[1]Progressive also sued Republic Corporation, the general partner of Republic National Industries of Texas, LP, formally seeking to attach liability in its role as general partner.  For purposes of this opinion, the general partner is subsumed in the term "Republic."

to Progressive on the mistaken belief that Progressive was billing for Tenco's work and that Progressive had an assignment to collect Tenco's accounts.

Republic filed a motion for summary judgment seeking to negate at least one essential element of each of Progressive's claims and another traditional motion for summary judgment on its counterclaim. The trial court granted both motions in Republic's favor and entered a final judgment declaring that Progressive take-nothing on its claims, ordering Progressive to return the money Republic paid to Progressive for work completed by Tenco, and awarding attorney fees to Republic. On appeal, Progressive argues that summary judgment was improper on the breach of contract and quantum meruit causes of action because there was a genuine issue of material fact as to whether BMB completed the work referenced in the invoices instead of Tenco.[2]

We review de novo the grant of a motion for summary judgment. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). To prevail on a traditional motion for summary judgment, the movant bears the burden of showing no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). If a defendant conclusively negates one of the essential elements of a cause of action, then the defendant is entitled to summary judgment as to that cause of action. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995); *Davis v. Education Serv. Ctr.*, 62 S.W.3d 890, 893 (Tex. App.—Texarkana 2001, no pet.). Once the defendant produces evidence entitling it to

---

[2]Progressive states, "A suit on sworn account is not a substantive cause of action, but a procedural device to pursue a contract claim." *See Hollingsworth v. Nw. Nat'l Ins. Co.*, 522 S.W.2d 242, 245 (Tex. Civ. App.—Texarkana 1975, no writ) (classifying suit on sworn account as rule of evidence which, if not properly denied, avoids necessity of proving correctness of account); *see also* TEX. R. CIV. P. 185. Thus, Progressive does not challenge the summary judgment on the sworn account claim per se. Instead, Progressive focuses on its claims for breach of contract and quantum meruit.

summary judgment, the burden then shifts to the plaintiff to present evidence that creates a fact issue. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

We review the summary judgment evidence in the light most favorable to the party against whom summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 208 (Tex. 2002).

The factual background leading to this lawsuit is critical to the parties' arguments on appeal. We begin by explaining Republic's relationship with Tenco—the company Republic claims actually performed the freight services referenced in Progressive's invoices.

Republic manufactures and installs cabinets, but does not deliver them to its customers. Instead, it engages the transportation services of third-party independent contractors. On April 6, 2008, Republic entered into an Independent Transportation Agreement (Agreement) with Tenco—then a Texas general partnership—to carry and transport Republic's goods to its customers. Specifically, Tenco agreed "to provide supervision and management of all of Republic's transportation and transportation-related activities from facilities owned or leased by Republic."

The Agreement contained two provisions allowing Republic to offset the cost for Tenco's transportation services. First, because Tenco used Republic's tractors and trailers under the Agreement, Republic was authorized to offset the value attributed to Tenco's use of this equipment against the amount owed by Republic to Tenco for transportation services, thereby

4

reducing the total amount owed by Republic to Tenco for transportation.[3]   Second, the Agreement also referenced a $117,833.10 promissory note executed by Tenco in Republic's favor and allowed Republic to "set off and deduct any amount due to it under the Promissory Note from any amounts it owes [Tenco] under this Agreement."

Both the promissory note and the Agreement bound Tenco's "successors and assigns," yet prohibited assignment of Tenco's obligations unless Republic agreed to the assignment in writing.  The promissory note, signed by Tenco on the same date that it signed the Agreement, also referenced the setoff provision in the Agreement and stated, "This Note will be binding on MAKER and MAKER's respective . . . successors and assigns, and shall not be assigned by any

---

[3]Specifically, the Agreement provided,

> **(b)      Republic Equipment.** Pursuant to that one certain Vehicle Lease Service Agreement, as amended and including all additions thereto and the Consent Agreement & Sublessee Acknowledgement, executed by Republic Industries, Inc., the predecessor in interest to Republic, on or about September 23, 1994 (hereinafter "VLSA"), Republic is in possession of the tractors as shown on the attached Appendix D (hereinafter "Republic Equipment").  Republic and Carrier hereby agree that Carrier will use in the performance of this Agreement said Republic Equipment as shown and listed in Appendix D. . . . Carrier shall pay Republic in full each month the actual costs associated with said Republic Equipment, including but not limited to, any and all costs associated with leasing, renting, operating, repairs, maintenance, licensing, registration and insurance, for the Republic Equipment.  All such costs related to Republic Equipment and due Republic, will be withheld from any payment due to Carrier for the 4th week of each fiscal month.  If such amount due Republic exceeds the total invoiced amount due Carrier, then any remaining balance will be withheld from the next weeks' payment to Carrier, until the balance is paid in full.
>
> . . . .
>
> **(d)      Trailers.**  Upon the effective date of this Agreement, Carrier shall assume operational responsibility for all trailers owned and/or leased by Republic ("Republic Trailers").  Carrier acknowledges and agrees that it has received the Republic Trailers in good order and condition as of the Effective Date.  Carrier shall pay Republic in full each month the actual costs associated with said Republic Trailers, including but not limited to, any ancillary costs associated with leasing, renting, operating, repairs, maintenance, licensing, registration and insurance, for the Republic Trailers.  All such costs related to Republic Equipment and due Republic, will be withheld from any payment due to Carrier for the 2nd week of each fiscal month.  If such amount due Republic exceeds the total invoiced amount due Carrier, then any remaining balance will be withheld from the next weeks' payment to Carrier, until the balance is paid in full.

MAKER without the prior written consent of HOLDER." The Agreement, which was "binding on . . . the parties . . . and their respective successors," also stated, "Neither party to this Agreement may assign or subcontract all or any portion of its obligations hereunder to another party without the prior written consent of the other party." The Agreement was effective for thirty months, and thereafter on a month-to-month basis until terminated on ninety days written notice by either party.

At the time that the Agreement was signed, Tenco's partners were Billy Michael Doty and Ben Standridge. Although he was not a Republic employee, Doty officed at Republic's headquarters and assisted in the day-to-day business operations of Republic. Doty testified that Republic's in-house counsel, Mike Duncan, assisted Tenco in changing its corporate form from a general partnership into a Texas limited liability corporation. According to Doty, Tenco was doing business with Republic under the same Agreement.[4]

All of Tenco's transactions with Republic were documented by "Load Out Sheets" that listed the name of the carrier, unique assigned load number, ship date, mileage traveled, delivery date and time, recipient, and details of the load delivered.[5] When Republic's cabinets were delivered to the customer, the customer or person receiving the load signed a bill of lading confirming the delivery. After the load delivery, Tenco would send Republic an invoice, and Republic would pay the invoice after applying any offsets allowed under the Agreement.

---

[4]Accordingly, we refer to Tenco Transportation, both the general partnership and the limited liability company as "Tenco."

[5]The Load Out Sheets attached the bill of lading for each completed delivery.

6

Republic's offsets under the agreement continued as contemplated by the Agreement until it began receiving Progressive invoices in June 2011.

Progressive's business is to collect accounts that are assigned to it by third parties. Robert Whitaker, Progressive's treasurer and vice president of finance, explained that independent agents use Progressive's load management system to input delivery data so that Progressive can bill and collect payment on the agent's behalf.[6]

Republic received invoices on Progressive letterhead from June through late July 2011, totaling $60,436.67. The face of the invoices did not mention the name of the carrier, and most simply stated that the carrier's accounts had been assigned. Each Progressive invoice contained the unique assigned load number and separately attached Republic's Load Out Sheets. It is undisputed that all of the load numbers on the invoices and the matching and attached Load Out Sheets pointed to Tenco as the carrier. Because it believed that Progressive was billing for Tenco's work and because the invoices contained language of assignment, Republic paid the June-July invoices. But then, questions arose about Progressive's role in the matter.

The invoices Republic received from Progressive from August 3 to October 17, 2011, also did not contain the name of the carrier. Unlike the June–July invoices, language evidencing any assignment was omitted from invoices dating August 24 through October 12, 2011. Nevertheless, Republic still believed that Progressive was billing for Tenco's services due to the unique assigned load numbers on the invoices that suggested Tenco was the carrier and the attached Load Out Sheets listing Tenco as the carrier. This time, however, according to Republic

---

[6]According to Whitaker, Progressive also provides human resources functions and guidance with safety and regulatory compliance.

7

employee Marsha Durham, Republic did not pay the invoices as a result of offsets allowed under the Agreement.

From October 18 to October 31, 2011, Republic received Progressive invoices that—for the first time—contained a BMB logo and identified the carrier as BMB.[7] Republic's employee, Joey Keith Little, testified that the loads identified by the invoices had been hauled, but that Republic did not pay the invoices because it was not aware of BMB as a separate entity from Tenco.[8] Again, the unique assigned load numbers on the invoices suggested Tenco as carrier and the Load Out Sheets attached to these invoices identified Tenco as the carrier.

On October 27, 2011, Jeffrey Kroyer, Republic's Senior Vice President of Operations who managed the shipment and delivery of Republic's products to its customers, notified Progressive that Republic had discontinued using Tenco's services and that the amounts due under the Progressive invoices would be offset by the loan balance. In response, on November 14, 2011, Progressive's counsel, Robert R. Kasak, wrote, "Progressive . . . has no relationship whatsoever with Tenco Transportation . . . . As a result, Progressive has no obligation for any debts incurred by Tenco." Indeed, Progressive's claim was based on a document titled "Assignment of Revenue and Carrier Service Agreement," which showed an

---

[7]The October 31, 2011, invoices were for work that had been completed October 25, 2011.

[8]Republic sent an email to Progressive employee, Richard Domotor, to ask if BMB was Tenco. Unfortunately, Domotor's reply is absent from the appellate record.

8

assignment of transportation revenue from BMB to Progressive. The assignment was dated June 9, 2011, and was signed on behalf of BMB by its owner, Patti Pyatt.[9]

In reply, Kroyer wrote, "Republic recognizes Progressive as a billing agent for Tenco, as was clarified by Tenco in June 2011. Republic has no agreement with Progressive, but instead had an active agreement with Tenco during the time in question. All loads were tendered to Tenco, dispatched to Tenco and delivered by Tenco."

Because Republic learned that Progressive had no assignment agreement in Tenco's name and sought to collect only on behalf of BMB—a company that Republic claimed that it had no contract with—Republic refused to pay the invoices. It chose instead to offset the cost of the invoices pursuant to the Agreement because it believed Tenco had performed the services for which Progressive was billing.

When Republic refused to pay the remaining invoices, Progressive sued Republic, claiming in its verified petition that Progressive—not Tenco or BMB—found carriers and drivers at Republic's request, but that Republic failed to pay seventy-five invoices for those services totaling $73,310.84.[10] Progressive's causes of action included breach of contract and quantum meruit. The petition attached invoices dating from August 3, 2011, to October 31, 2011,[11] with a

---

[9]The assignment clarified that Progressive had no carrier-related duties. Instead, Progressive was simply assisting with BMB's billing and collection efforts in exchange for a percentage of the linehaul revenue collected.

[10]Progressive's verified claim and arguments to the trial court stated that Progressive had directly provided services to Republic. Progressive has abandoned this position on appeal.

[11]These invoices reflect work completed by the carrier from July 28 to October 25, 2011.

9

notation to remit payment to Progressive.[12]   Only a few of these attached invoices contained notice of assignment language.

In its verified answer, Republic asserted that Progressive did not find carriers or drivers for Republic.[13]   Instead, Kroyer swore on Republic's behalf that there was no agreement between Republic and BMB, that Progressive's claims arose entirely from contractual dealings with third-party, Tenco, that Tenco actually provided transportation-delivery services, that all of the shipments and deliveries covered by Progressive's invoices were transactions conducted between Republic and Tenco, that Tenco owed Republic $117,833.10 pursuant to the promissory note, that Tenco deducted the amount of the invoices from the principal and interest which it owned to

---

[12]The invoices attached to Progressive's petition (except for the first one), contain BMB's logo.  Kroyer swore that Republic did not receive invoices with BMB's logo until October 18.  The invoices actually received by Republic were attached to Kroyer's affidavit and support his account.  Progressive's Treasurer and Vice President of Finance, Robert Whitaker, confirmed that only the last eight invoices that Progressive sent to Republic bore the BMB logo and that the invoices attached to Progressive's petition had been changed after-the-fact to add BMB's logo pursuant to Doty's request.

[13]"Generally, pleadings are not competent evidence, even if sworn or verified."  *Livingston Ford Mercury, Inc. v. Haley*, 997 S.W.2d 425, 431 (Tex.  App.—Beaumont 1999, no pet.).  The exception to the general rule, of course, is found in a suit on sworn account.  *Id*.  Rule 185 of the Texas Rules of Civil Procedure (the Rule governing suits on sworn accounts) states,

> When any action or defense is founded upon an open account . . . including any claim for a liquidated money demand based upon written contract or founded on business dealings between the parties, or is for personal service rendered, or labor done or labor or materials furnished, . . . and is supported by the affidavit of the party, his agent or attorney taken before some officer authorized to administer oaths, to the effect that such claim is, within the knowledge of affiant, just and true, that it is due, and that all just and lawful offsets, payments and credits have been allowed, the same shall be taken as prima facie evidence thereof, unless the party resisting such claim shall file a written denial, under oath . . . . No particularization or description of the nature of the component parts of the account or claim is necessary unless the trial court sustains special exceptions to the pleadings.

TEX. R. CIV. P. 185.  "It is settled . . . that a defendant's verified denial of the correctness of a plaintiff's sworn account in the form required by Rule 185 destroys the evidentiary effect of the itemized account attached to the petition and forces the plaintiff to put on proof of his claim."  *Rizk v. Fin. Guardian Ins. Agency, Inc*., 584 S.W.2d 860, 862 (Tex. 1979); *see S. Mgmt. Servs., Inc. v. SM Energy C*o., 398 S.W.3d 350, 353 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

Republic under the promissory note in lieu of Republic paying the invoices, and that the amounts claimed by Progressive were not just and true. Because Progressive had admitted that Tenco had not assigned any accounts to Progressive, Republic also filed a counter-claim against Progressive seeking to recover for the June–July invoices that it had paid under the mistaken assumption that Progressive was billing for Tenco's work.

Republic then filed a motion for summary judgment seeking to negate at least one element on all of Progressive's claims.[14] Progressive responded that there was a genuine issue of material fact as to whether BMB had performed the services under Tenco's contract instead of Tenco and that this fact issue precluded summary judgment on its suit for breach of contract and quantum meruit. Republic's response argued that Tenco's obligations under the Agreement could not be assigned and that there was no evidence BMB, instead of Tenco, performed the work covered by Progressive's invoices.

The trial court granted Republic's first motion for summary judgment December 20, 2013. Thereafter, Republic filed another motion for summary judgment seeking to establish its counterclaim and to defeat Progressive's affirmative defenses to the counterclaim.[15] Republic attached another affidavit from Kroyer setting forth the amount Republic paid Progressive as

---

[14]Republic's motion for summary judgment contained the following statements: (1) "The undisputed evidence is that there were no agreements between the parties," (2) "there was no valid contract between Republic and Progressive or BMB Logistics and, accordingly, no breach," (3) "[t]here was no account between Progressive or BMB Logistics and Republic," (4) "[t]he undisputed evidence in this case proves . . . the non-existence of the first and third elements [of a suit on sworn account]—no sale and delivery of goods or services by Progressive or BMB Logistics to Republic," (5) "quantum meruit is not available . . . [because] Progressive and BMB Logistics did not render services or furnish materials to Republic." The motion for summary judgment did not discuss Republic's affirmative defenses of accord and satisfaction, estoppel, offset, payment, and waiver.

[15]In its appellate brief, Progressive affirmatively states that it is not challenging the trial court's summary judgment as to these affirmative defenses.

evidenced by copies of the checks Republic issued to Progressive and an attorney fee affidavit concluding that $47,646.00 was a reasonable and necessary fee and that $17,500.00 in reasonable and necessary attorney fees would be incurred to defend an appeal.

The trial court granted Republic's second motion for summary judgment. Thereafter, it entered a final, take-nothing judgment against Progressive on its claims, awarded $60,436.67 on Republic's counterclaim, and ordered Progressive to pay $47,646.00 in attorney fees and $17,500.00 in the event of an unsuccessful appeal.

*(1)* *Denying Progressive's Claims Was Proper*

Progressive argues that the trial court erred in granting summary judgment denying its claims of breach of contract and quantum meruit. We disagree.

*a.* *Breach of Contract*

The elements of a claim for breach of contract are (a) a valid, enforceable contract, (b) performance under the contract by the claimant, (c) breach by the defendant, and (d) an injury to the claimant caused by the breach. *Werline v. E. Tex. Salt Water Disposal Co.*, 209 S.W.3d 888, 898 (Tex. App.—Texarkana 2006), *aff'd*, 307 S.W.3d 267 (Tex. 2010). To establish the first element, existence of a valid contract, the plaintiff must show (a) an offer, (b) acceptance, (c) meeting of the minds, (d) each party's consent to the terms, and (e) execution and delivery of the contract with the intent that it be mutual and binding. *Cessna Aircraft Co. v. Aircraft Network, L.L.C.*, 213 S.W.3d 455, 465 (Tex. App.—Dallas 2006, pet. denied). Republic's summary judgment evidence must have conclusively established its entitlement to judgment as a

12

matter of law on the breach of contract and quantum meruit claims before the burden shifted to Progressive to create a fact issue precluding summary judgment.

Republic relied on the Agreement, the Tenco promissory note, letters between Kroyer and Kasak, Load Out Sheets showing Tenco as the carrier, Progressive's interrogatory responses stating that no relationship existed between Progressive and Tenco, and an affidavit filed by Kroyer.

In the affidavit, Kroyer, who oversaw all performance under the Agreement on Republic's behalf, swore (a) that "Tenco and Republic performed under the Transportation Agreement from April, 2008 until October, 2011";[16] (b) that "[a]ll of the deliveries identified in the unpaid Progressive invoices . . . were tendered by Republic to Tenco, dispatched by Tenco, and delivered by Tenco under the [Agreement]"; (c) that none of the deliveries referenced in the unpaid invoices were dispatched or delivered by Progressive or BMB; (d) that Republic never entered into a contract or agreement with Progressive or BMB; (e) that Republic never requested Progressive or BMB Logistics to provide services or goods, including, specifically, any transportation or transportation-related services; (f) that Republic did not receive the benefit of any services provided by Progressive or BMB; and (g) that Republic never consented that any deliveries under the Agreement would be made by any party other than Tenco.

To create a genuine issue of material fact as to whether BMB, instead of Tenco, had completed the work referenced in the invoices, Progressive relied on Doty's deposition testimony. Doty testified that Tenco was involved in several accidents, that some of the

---

[16]Kroyer's October 27, 2011, letter to Progressive stated that Republic had terminated its contract with Tenco.

13

accidents resulted in fatalities, and that the cost of insurance became too much for Tenco to bear. In order to obtain a more reasonable insurance rate, Doty testified that Tenco underwent a name change from Tenco to PBM Logistics, LLC (PBM).[17] Doty added, "When we changed company names [Republic] w[as] informed of it beforehand, when it happened, when it was done."

Doty testified that Tenco ceased operating under its name "when we started PBM," but was unsure whether Tenco was dissolved as an entity. While there was no written termination notice with Tenco as required under the Agreement, Doty also believed that Republic ceased doing business with Tenco and began doing business with PBM under a new transportation agreement.[18] Even though Doty referenced a new agreement with PBM, he admitted that the work that was being completed by PBM was always invoiced under Tenco's name because he "didn't change the name on the computer." Doty explained how he used Progressive's load management system. He said, "We would put the specifics of the load in there, where it was going, when it was going to be picked up. . . . And when we completed the load, we would mark it completed and it would final out." The certificates of liability insurance provided by Doty to Republic, effective from August 2010 until August 2011, identified the insureds as "PBM Logistics, LLC and Billy M. Doty, d/b/a Tenco Transportation." Doty believed that the inclusion of Tenco's name on the certificates of insurance was a mistake.

---

[17]Because Doty was not involved with the paperwork, he was unable to clarify the process by which the name change occurred, whether Tenco simply started doing business as PBM, or whether PBM succeeded Tenco as an entity and was doing business under Tenco's name.

[18]There is no transportation agreement with PBM in this Court's appellate record.

14

In the following portion of his deposition, Doty also suggested that PBM might have changed its name to BMB.

> Q. Throughout the period that you used Progressive, it's your testimony that it was PBM that was doing the freight hauling for Republic?
>
> A. No, sir, it was PBM to begin, and then it went to BMB.
>
> Q. And when did it go to BMB?
>
> A. I don't remember the date, but the billing changed.[19]
>
> Q. Well, I understand --
>
> A. -- to reflect BMB.
>
> . . . .
>
> Q. Okay. And what was the reason it went from -- or it changes from PBM to BMB?
>
> A. We had to -- Our insurance -- You know, when we changed from -- PBM -- to BMB, we -- we were having some problems with a fatality accident.
>
> Q. And -- Right. And when was that?
>
> A. That happened about a year ago, I believe, a little more. I can't remember when it was. It . . . [m]ust have been in the winter of '11, yes, sir.

Doty testified that PBM went out of business sometime in 2011, and "then it went to BMB." The following discussion shed some light on Doty's statement:

> Q. How did Republic become a customer of BMB?

---

[19]Doty did not further clarify when the billing changed.

A. We changed over. I went and told them. I said, "Listen, we're going to BMB. Progressive is still going to bill you just as always. They will only -- it will be as -- billed as BMB," and I told them why.

Q. And who did you tell this to?

A. I told it to everybody that I normally talk to.

Q. Tell me the names of the people you told this.

A. Jeff Kroyer, Brian Roper, Joey Little, LaSonya Williams. Anybody I did normal -- you know, I didn't discuss it with the plant manager or anybody.

Q. I understand.

A. Everybody that was in the loop as far as -- as the business part of it, I -- I told them straight up about it. There's no secrets.

Q. When did BMB start doing business in the -- in the freight shipping business?

A. I'm not -- I'm not real sure.

Q. What year?

A. It was in -- had to have been in 2012, I believe.

Q. This year?

A. I -- I may be wrong about that.

Doty agreed that Republic never entered into a new agreement with BMB even though Republic required a written Transportation Agreement with every carrier. Yet, Doty testified,

[O]ur trucks had the correct company name on the side of them from the first day, you know. The insurance that we provided had the correct name on it from the first day. This paperwork like this was not a -- you know, just a minor oversight. It didn't matter to anybody. Everybody knew what was going on.

16

Here, it is undisputed that Republic had no written contract with BMB or Progressive, and, to avoid any offset that would be allowed under the Agreement, Progressive denied any relationship with either Tenco or its successor companies, if any. The Agreement obligated Tenco to provide all of Republic's transportation needs and required Republic's written consent before any assignment of Tenco's obligations under the contract. Kroyer swore that Tenco actually provided transportation services referenced in Progressive's invoices, as demonstrated by the Load Out Sheets. He also swore that Republic never consented for any deliveries under the Agreement to be made by any company other than Tenco. Republic's evidence demonstrated that there was no valid, enforceable contract with BMB during the timeframe referenced in Progressive's invoices.

In the face of this evidence, Progressive was required to raise a genuine issue of material fact showing that BMB completed the work referenced in the invoices instead of Tenco. Contrary to Progressive's arguments, we find that Doty's testimony fell short of meeting this task. Doty did not speak about the specific invoices at issue in this lawsuit and never stated that BMB, as an entity separate and apart from Tenco or its successor companies, did the work for Republic during the time period in question.

In order to raise a genuine issue of material fact, Progressive was required to bring forth some evidence showing that Republic engaged BMB's services before October 25, 2011—the last delivery date referenced on Progressive's invoices to Republic. Here, Doty merely said that PBM went out of business sometime in 2011 and "then it went to BMB." Doty failed to state whether PBM went out of business before or after Republic received Progressive's invoices.

17

Although he stated that the company name changed from PBM to BMB because it was having problems with a fatality accident that occurred in the winter of 2011, Doty did not state that Republic engaged BMB in the winter of 2011 to provide freight services. In fact, Doty testified that it was not until 2012—well after Republic received Progressive's invoices—that BMB actually began doing business and that Republic was made aware of BMB.

Further, Doty's assertion that "it went to BMB" fails to negate Kroyer's affidavit that Republic never engaged BMB's services before October 25, 2011. At the time of his deposition on October 22, 2012, Doty testified that he worked for BMB as a mechanic and that he had been employed by BMB for only around six months. Further, because he was neither an employee of Republic nor employed by BMB in any capacity other than a mechanic, there is no evidence suggesting that Doty could bind either Republic or BMB to a transportation agreement.

Moreover, taking the evidence in the light most favorable to Progressive, Doty's testimony establishes, at best, that Republic was aware of PBM before receiving Progressive's invoices, that Republic might have been doing business with PBM, and that PBM might have changed its name to BMB at some point.[20] If either Tenco had been dissolved and replaced by PBM or BMB, or Tenco's name was changed to PBM and then to BMB, the obligations under the promissory note and the Agreement did not change. In any event, Progressive's evidence does not suggest that Republic engaged BMB's services until 2012.

---

[20]We note that the BMB assignment was signed by BMB's owner, Patti Pyatt—not Doty or Standridge. There is no evidence of any relationship between Pyatt and Doty or Standridge.

A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* On the other hand, the evidence amounts to no more than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" of fact. *Id.* Based on the record before us, we find that Republic conclusively established that BMB did not perform the services referenced in Progressive's invoices and that Progressive did not create a genuine issue of material fact suggesting otherwise.[21] Consequently, we find proper the trial court's summary judgment against Progressive on its claim of breach of contract.

---

[21]After the trial court had entered its summary judgment on the breach of contract claim, Progressive asked the trial court to reconsider the possibility of an implied contract. "'The elements of a contract, express or implied, are identical'; there must be an offer, an acceptance, a meeting of the minds, each party's consent to the terms, and execution and delivery of the contract with the intent that it be mutually binding." *Plotkin v. Joekel*, 304 S.W.3d 455, 476 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (quoting *Univ. Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex. App.—San Antonio 1989, no writ)). "[T]he real difference between express contracts and those implied in fact is in the character and manner of proof required to establish them." *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972). "In each instance there must be shown the element of mutual agreement which, in the case of an implied contract, is inferred from the circumstances." *Id.*; *see Angeles v. Brownsville Valley Reg'l Med. Ctr., Inc.*, 960 S.W.2d 854, 859 (Tex. App.—Corpus Christi 1997, pet. denied) ("An implied contract arises from the dealings of the parties, from which the facts show that the minds of the parties met on the terms of the contract without any legally expressed agreement thereto."). Here, Progressive's claims on the invoices relied on the charges anticipated by Republic pursuant to the Agreement. There is no contention that BMB adopted the terms and conditions of the Agreement or that there were any dealings between BMB and Republic prior to October 25, 2011. Progressive did not plead the implied contract theory and presented no evidence of any offer to or from BMB, and no evidence of a meeting of the minds on any terms of a transportation agreement between Republic and BMB. *See Stern v. Wonzer*, 846 S.W.2d 939, 945 (Tex. App.—Houston [1st Dist.] 1993, no writ) (holding failing to plead implied contract theory prevented appellants from raising issue on appeal even though argument on implied contract was made before trial court); *see also Hill v. Aldrich*, 242 S.W.2d 465, 466 (Tex. Civ. App.—San Antonio 1951, writ dism'd); *Henderson v. Davis*, 191 S.W. 358, 359 (Tex. App.—Texarkana 1917, no pet.).

*b.* *Quantum Meruit*

The doctrine of quantum meruit is based on the equitable principle that a party deserves to be paid for the services or materials furnished to one who knowingly accepts them. *See Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992); *Davidson v. Clearman*, 391 S.W.2d 48, 49 (Tex. 1965). This remedy is based on the promise implied by law to pay for beneficial services rendered and accepted. *Davidson*, 391 S.W.2d at 49; *see Campbell v. Nw. Nat'l Life Ins. Co.*, 573 S.W.2d 496, 498 (Tex. 1978). To recover under the doctrine of quantum meruit, Progressive was required to establish that (a) valuable services and/or materials were furnished, (b) to the party sought to be charged, (c) which were accepted by the party sought to be charged, and (d) under such circumstances as reasonably notified the recipient that BMB, in performing, expected to be paid by the recipient. *See Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985); *Heldenfels Bros., Inc.*, 832 S.W.2d at 41 (quoting *City of Ingleside v. Stewart*, 554 S.W.2d 939, 943 (Tex. Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.)).

As explained above, Kroyer's affidavit swore that Republic had no dealings with BMB before October 25, 2011. Doty's testimony established that BMB began doing business in 2012 and that Republic was made aware of BMB in 2012. Our review of the summary judgment evidence leads us to conclude that BMB did not perform services for Republic before October 25, 2011, under such circumstances as reasonably notified Republic that BMB expected to be paid by Republic for those services. Rather, the evidence established that, pursuant to the Agreement, Tenco or its successors performed the services referenced in Progressive's invoices.

20

Therefore, we find that the trial court's summary judgment against Progressive on its claim for quantum meruit was proper.[22]

*(2)     Awarding Republic Recovery on Its Overpayments Was Proper*

After Republic secured the first summary judgment, it filed a traditional summary judgment on its claim for money had and received for the June–July paid invoices. "'Money had and received' is an equitable doctrine applied to prevent unjust enrichment." *Phippen v. Deere & Co.*, 965 S.W.2d 713, 725 n.1 (Tex. App.—Texarkana 1998, no writ). "An action for money had and received arises when one person obtains money which in equity and good conscience belongs to another, . . . and it belongs conceptually to the doctrine of unjust enrichment." *Id.*

Whittaker testified that the invoices Progressive had sent to Republic for the first seven weeks were pursuant to an assignment from Redden Transportation. Doty never mentioned Redden Transportation in his deposition, and there was no evidence suggesting that it was somehow related to Tenco, PBM, or BMB. Kroyer filed an affidavit setting forth the amounts Republic paid to Progressive and attached copies of checks supporting the figure. Progressive did not "dispute that it was paid $60,436.67" for the June–July invoices. In response to a request

---

[22]We also note that a plaintiff who seeks to recover the reasonable value of services rendered or materials supplied will be permitted to recover in quantum meruit or unjust enrichment only when there is no express contract covering those services or materials. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683–84 (Tex. 2000). When a valid agreement already addresses the matter, there can be no recovery for unjust enrichment or quantum meruit if the same subject is covered by the express contract. *TransAmerican Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 600 (Tex. App.—San Antonio 1996, writ denied); *Lone Star Steel Co. v. Scott*, 759 S.W.2d 144, 154 (Tex. App.—Texarkana 1988, writ denied). Corporate structures have meaning. Doty's testimony did not clarify the question that Republic initially asked Domotor—whether BMB was Tenco. If Tenco just ceased operating under its name and Tenco still existed as an entity, the Agreement—including the obligation under the promissory note and right of setoff—applied. If Tenco was truly succeeded by BMB as an entity, then the Agreement still applied. Under either of these scenarios, the equitable remedy of quantum meruit would be unavailable. However, if Tenco was an entity separate and apart from BMB, then, because Doty could not bind Republic, Progressive was required to show some engagement between Republic and BMB, which it did not do.

21

to "identify who assigned to Progressive the invoices sent to Republic, copies of which are Bates-stamped 'Republic 00301-00346,'" Progressive admitted that "there was no assignment." The Bates-stamp references established that there was no assignment of the paid June–July invoices.[23] Therefore, because Progressive admitted that it had no assignment from anyone to collect these invoices, and because Republic conclusively established that BMB did not do the work referenced in the invoices, Republic met its burden to show that the money for the June–July invoices did not belong to Progressive. Accordingly, we find that the trial court's summary judgment in favor of Republic on its overpayment claim was proper.

*(3)    Republic Was Not Entitled To Recover Attorney Fees*

Texas law does not allow recovery of attorney fees unless authorized by statute or contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006). Because Republic could not recover attorney fees for defeating Progressive's claims, Republic sought to recover attorney fees on its counterclaim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (West 2008); *Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 40–41 (Tex. 2012). In this regard, Republic's counsel, Joe Chumlea, filed an attorney fee affidavit swearing that the fees incurred in defending against Progressive's claims were necessary to Republic's counterclaim for money had and received. In other words, he claimed that "all of the legal services [provided in the case] . . . would have been necessary even if Republic's counterclaim was the only matter filed in this suit." Relying on Chumlea's affidavit, the trial court awarded Republic $47,646.00—the amount it spent on attorney fees for the entire litigation.

---

[23]Further, the first five June invoices were for work that was completed before BMB's assignment to Progressive.

However, Progressive argues that attorney fees are not available on a claim for money had and received since there is no statute or contract specifically allowing for their recovery under that cause of action. Republic argues that it sought attorney fees on its counterclaim under Section 38.001(4) of the Texas Civil Practice and Remedies Code, providing for recovery of reasonable attorney fees "if the claim is for: . . . (4) freight or express overcharges." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(4).

Republic argues that Progressive sent seventy-five invoices for freight charges, even though Progressive admitted that it had no assignment of the June–July invoices and that it was generally billing for work performed by another company that had not assigned its accounts to Progressive. Thus, Republic argues that its counterclaim was for a freight or express overcharge. Progressive counters by arguing that Republic complained only that the charges were mislabeled as BMB's charges instead of Tenco's and that there was no claim that the invoice charges were unjust or too high. Thus, we must determine whether a misdirected charge equals an overcharge.

We begin by noting that the prior versions of Section 38.001, which were enacted before 1977, addressed only the issue of when a party could recover attorney fees on a claim for breach of contract. *G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co.*, 177 S.W.3d 537, 547 n.3 (Tex. App.—Dallas 2005, no pet.). Under the prior iterations of the statute, a party was not entitled to recover attorney fees for breach of contract unless the breached contract concerned personal services rendered, labor performed, material furnished, overcharges for freight or express, lost or damaged freight or express, or killed or injured stock—items that later became part of the current Section 38.001 list. *Id.* The cases specifically addressing recovery of attorney fees for freight or

23

express overcharges all involve lawsuits between shippers and carriers where the typical recovery was sought from the carrier who had overcharged for its services. *See generally Sw. Motor Transport Co. v. Valley Weathermakers, Inc.*, 427 S.W.2d 597 (Tex. 1968)*; Nationwide Horse Carriers, Inc. v. Johnston*, 519 S.W.2d 163 (Tex. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.); *Strickland Transp. Co. v. Kool Kooshion Mfg. Co.*, 230 S.W.2d 277 (Tex. Civ. App.—Fort Worth 1950, no writ). This is because the carrier's charge must ultimately come from the carrier, which, it is assumed, has some sort of an agreement to carry goods for the shipper.

Because statutes authorizing the award of attorney fees are penal in nature and in derogation of the common law, we must strictly construe them. *New Amsterdam Cas. Co. v. Tex. Indus., Inc.*, 414 S.W.2d 914, 915 (Tex. 1967). Under Section 38.001, the claim must be for a freight or express overcharge. Here, the claim was for money had and received. As explained by Doty, the charges for the carrier services were entered by him. Thus, compensation for an overcharge could have been recovered from the carrier only. By securing a summary judgment on its counterclaim, Republic did not absolve itself of liability of paying for the services of a carrier, it merely established that, because BMB was not the carrier, Progressive was not entitled to recover for the June–July invoices. The fact that Republic paid the June–July invoices does not transform the gravamen of Republic's complaint into one involving a carrier overcharge. Given the history and common application of the provision at issue here, we hold that Section 38.001(4) does not authorize recovery from a collection agency for freight charges made by a carrier when the shipper does not complain that the carrier's charges constituted overcharges.

24

Therefore, we sustain Progressive's last point of error, and reverse the trial court's award of attorney fees.

We modify the trial court's final judgment by deleting the award of attorney fees and affirm the trial court's judgment as modified.


Josh R. Morriss, III
Chief Justice

Date Submitted:     November 10, 2014
Date Decided:      February 5, 2015