

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-14-00224-CV**

WANDA YOUNG, TOMMIE YOUNG,                  APPELLANTS
COURTNEY YOUNG, ASHLEY
YOUNG, AND JUSTIN YOUNG

V.

PULTE HOMES OF TEXAS, L.P.,                       APPELLEES
HORIZON PLUMBING, LTD., AND
STARN AIR, INC.

----------

FROM THE 431ST DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 2011-70500-431

----------

# MEMORANDUM OPINION[1]

----------

This is a suit for damages resulting from mold in a home. Appellants

Wanda Young, Tommie Young,[2] and their children, Appellants Courtney Young,

---

[1]*See* Tex. R. App. P. 47.4.

[2]Throughout the record, his name is spelled sometimes as "Tommie" and sometimes as "Tommy".

Ashley Young, and Justin Young, sued Appellee Pulte Homes of Texas, L.P., Appellee Starn Air, Inc., and Appellee Horizon Plumbing, Ltd., alleging that a leak from their air conditioning system caused mold throughout their home. They subsequently added Horizon as a defendant. The trial court dismissed Wanda and Tommie's claims for lack of jurisdiction based on their previous filing of bankruptcy, granted no-evidence summary judgment on Courtney, Ashley, and Justin's claims against Pulte and Starn, and granted Starn attorney's fees against Courtney, Ashley, and Justin (the Young children).

On appeal, the Youngs argue that the trial court erred by dismissing Wanda and Tommie's claims and abused its discretion by awarding attorney's fees for Starn against the Young children. Because we hold Wanda and Tommie's bankruptcy did not preclude their claims in this suit and that the Young children's claims were not groundless under the Deceptive Trade Practices-Consumer Protection Act[3] (DTPA), we reverse the trial court's judgment.

**Background**

In July 2005, Wanda and Tommie signed a contract with Pulte for the purchase of a new construction home to be substantially completed by October 2005. They closed on the home in November 2005 and moved into it with their children Courtney, Ashley, and Justin. At the time that they closed on the home, Justin was thirteen years old, Ashley was fifteen, and Courtney was nineteen and was still living at home.

---

[3]Tex. Bus. & Com. Code Ann. § 17.41–.63 (West 2011 & Supp. 2016).

2

In October 2008, Wanda and Tommie filed for Chapter 13 bankruptcy. Their plan was confirmed on March 5, 2009.

In June 2010 (while Wanda and Tommie's bankruptcy was still pending), Wanda noticed water in their home. The Youngs hired Ohlen-Air, Inc. to inspect the air conditioning system. The Ohlen-Air technician found that the HVAC unit was not draining correctly because the condensation line was improperly connected.

The Youngs hired Stan Parish, a licensed mold assessment consultant,[4] to assess any mold damage and prepare a mold remediation protocol. Parish's inspection found "very high elevations of Aspergillus and Penicillium," which he described in his report as being "capable of producing mycotoxins which can be harmful to humans." Parish concluded from his inspection and information provided by the Youngs that "[t]he moisture source originated in the attic as a result of an incorrect connection of the condensation drain line." Parish recommended that the Youngs have a qualified contractor perform extensive remediation of their home and remediation or replacement of their personal belongings that had been in the affected areas.[5]

---

[4]*See* Tex. Occ. Code Ann. §§ 1958.001–.304 (West 2012 & Supp. 2016) (regulating the profession of mold assessors and remediators and imposing license requirements).

[5]*See id.* at § 1958.155(a) (West Supp. 2016) (providing that a license holder may not perform both mold assessment and mold remediation on the same project).

On November 17, 2010, Wanda and Tommie converted their Chapter 13 bankruptcy to Chapter 7. A new trustee, Areya Holder, was appointed.

On May 19, 2011, the Youngs sued Pulte and Starn for negligence and violations of the DTPA based on the mold damage. They alleged that Starn had installed the HVAC system and that Pulte and Starn had failed to exercise ordinary care in the system's installation. By amended petition, the Youngs added Horizon Plumbing, alleging that it had been involved in installing the HVAC system. The DTPA claims alleged that Pulte, Starn, and Horizon had engaged in false, misleading, or deceptive acts or practices, engaged in an unconscionable action or course of action, and breached express or implied warranties.

Starn filed a motion to dismiss Wanda and Tommie's claims for lack of subject matter jurisdiction. It argued that they had failed to disclose their claims to the bankruptcy court, and therefore the claims remained in the bankruptcy estate, and Wanda and Tommie had no standing to assert them. Horizon Plumbing filed a motion to dismiss on the same basis.

Starn also filed a motion for no-evidence partial summary judgment on the Young children's claims. In Starn's summary judgment motion, it asserted that Courtney, Ashley, and Justin had no evidence that they suffered damages or that the damages were proximately caused by Starn and no evidence of the elements of their DTPA claims.

4

Courtney, Ashley, and Justin filed a response with evidence attached, including their own affidavits and Parish's report. Starn filed a reply that included objections that some of the evidence was hearsay, that Parish's report could not be considered because he had not been disclosed as an expert, and that the evidence of the Youngs' affidavits included opinion testimony that could not be considered because they were not experts. The trial court granted the motion, sustained the objections, and found that the Young children's DTPA claims were groundless.

Horizon also filed a motion for no-evidence partial summary judgment as to the Young children's claims on the same grounds as Starn. The Young children filed no response, and accordingly, the trial court granted the motion.

Pulte also filed a no-evidence motion for summary judgment as to the Young children's claims. The Young children filed a response, but Pulte objected that the response was untimely. The trial court granted Pulte's summary judgment motion.

In their response to Starn's motion to dismiss, Tommie and Wanda relied on the business records affidavit of Marina Lopez, an employee in the office of the bankruptcy trustee, and an attached recording of the creditor's meeting in their bankruptcy case. The Youngs alleged that this recording showed that they had disclosed the mold claims to the bankruptcy court, and the trustee had abandoned the claims. They also attached Wanda's affidavit in which she stated

that they had disclosed to the bankruptcy trustee that their home had mold, and they intended to file litigation related to the mold.

In the recording, the Youngs told trustee Holder that they had mold damage in their home and that their attorney had made a demand on their insurance company. Holder asked if they could sue anyone else, and the Youngs replied that it was just the insurance company. Holder, however, asked for their attorney's information so that she could talk to the attorney about the Youngs' claims. Their bankruptcy attorney stated that if there were a suit, he would probably claim homestead proceeds because the Youngs had lost their homestead.

Starn filed a reply objecting to Lopez's affidavit, and it filed a supplement to its motion to dismiss, arguing that the Youngs had to schedule their claims, and oral disclosure to the trustee was not sufficient. By supplemental response, the Youngs argued that because the case did not exist as of the time that they filed their chapter 13 case, the claims were not part of the bankruptcy estate, and they did not have a duty to disclose them. The Youngs made the same argument in response to Horizon's motion to dismiss. The trial court granted Starn's motion to dismiss. It also granted Horizon's motion to dismiss.

Starn filed a motion for judgment on attorney's fees against Courtney, Ashley, and Justin, taking the position that the Young children had "maliciously prosecuted" a groundless suit against it in order to "extort a settlement." The motion stated that, as the trial court had found that Courtney, Ashley, and

6

Justin's claims were groundless in fact and law, an award of attorney's fees was mandatory. After Wanda and Tommie's pending chapter 13 bankruptcy action was dismissed and the stay lifted, Starn filed a supplemental motion asking for fees from Wanda and Tommie.

Pulte then filed a motion to dismiss on the same ground as Starn's and Horizon's motions. Wanda and Tommie filed a response. They then filed a supplemental response to which they attached Holder's affidavit. Holder stated that the claim had been disclosed to her, and she pointed out that the rules of bankruptcy procedure do not require a person who has converted from a chapter 13 bankruptcy to a chapter 7 bankruptcy to file a schedule of property acquired after the petition but before conversion if, as with Wanda and Tommie's case, the bad faith statute does not apply.[6] She also stated that by order entered in their bankruptcy case, the state court litigation was not property of that bankruptcy estate. The trial court granted Pulte's motion.

After a hearing, the trial court ordered Courtney, Ashley, and Justin to pay attorney's fees to Starn in the amount of $38,958.00, plus court costs and conditional appellate fees. The court's order found that the children's claims under the DTPA were groundless.

The trial court filed a final judgment reflecting its prior orders. The Youngs filed a request for findings of fact and conclusions of law but then withdrew the request. Starn then moved for attorney's fees and sanctions against the Youngs

---

[6]*See* 11 U.S.C.A. § 348(f)(2) (West 2015).

7

for filing the requests. The trial court denied Starn's motion for the additional attorney's fees. The Youngs filed motions for new trial, which the trial court denied. They then filed this appeal.

## Discussion

*1. The parents' claims*

In the Youngs' first issue, they ask whether Wanda and Tommie had standing to assert their claims, and whether the trial court had jurisdiction over the claims when they accrued after they filed Chapter 13 bankruptcy but before the bankruptcy was converted to Chapter 7.

Section 348(f) of the bankruptcy code states unambiguously that, except when the debtor converts a case in bad faith,

> when a case under chapter 13 of this title is converted to a case under another chapter under this title[,] . . . property of the estate in the converted case shall consist of property of the estate, *as of the date of filing of the petition*, that remains in the possession of or is under the control of the debtor on the date of conversion.[7]

Nothing in the record indicates that the bankruptcy court made a finding of bad faith. Under section 348, then, the property of the converted chapter 7 bankruptcy estate included only property that was property of the chapter 13 estate as of the date of the filing of the chapter 13 petition. No property that the

---

[7]11 U.S.C.A. § 348(f)(1), (2) (West 2015) (emphasis added); *see also Harris v. Viegelahn*, 135 S. Ct. 1829, 1836, 191 L. Ed. 2d 783 (2015) (stating that conversion from chapter 13 to chapter 7 does not start a new bankruptcy case and does not change the date of the filing of the petition).

8

Youngs acquired between when they filed their chapter 13 petition and when they converted to chapter 7 was property of the converted case's estate.

Appellees counter section 348 by pointing to bankruptcy code section 1306 and this court's opinion in *Kilpatrick v. Kilpatrick*.[8] Under section 1306, property of the estate includes all property (of the kind specified in the bankruptcy code) that the debtor acquires after commencement of the case but before the case is closed, dismissed, or converted.[9] This section, however, "simply governs what property interests are included in an existing Chapter 13 estate, not what is included once the case converts to a Chapter 7 bankruptcy"[10]—that is, it applies to an unconverted chapter 13 case.

*Kilpatrick* does not help Appellees, either. That case involved a debtor's failure to disclose on his bankruptcy schedules property he had acquired *before* filing for bankruptcy.[11] Appellees focus on the language of *Kilpatrick* discussing the importance of the debtor's duty to disclose assets in the debtor's bankruptcy schedules.[12] But that case has no application in the context of this case. Here,

---

[8] 205 S.W.3d 690 (Tex. App.—Fort Worth 2006, pet. denied).

[9] 11 U.S.C.A. § 1306(a)(1) (West 2016).

[10] *In re Hodges*, 518 B.R. 445, 451 (E.D. Tenn. 2014).

[11] *Kilpatrick*, 205 S.W.3d at 694–95, 701 (stating that the appellant had acquired 900 shares of stock in 1993 and filed for bankruptcy in 1995 and holding that the shares, which were not disclosed to the bankruptcy trustee, remained with the bankruptcy estate after the bankruptcy was dismissed).

[12] *See id.* at 702.

the property at issue was acquired *after* the filing of a chapter 13 bankruptcy proceeding and before the conversion to chapter 7 bankruptcy. The bankruptcy code is unequivocal that, absent bad faith, property acquired after a chapter 13 petition filing and before conversion to a chapter 7 case is not property of the chapter 7 case.[13] Appellees' jurisdictional argument had no legal basis, and the trial court therefore erred by granting Appellees' motions to dismiss. We sustain the Youngs' first issue.

*2. The children's claims*

The Youngs' second issue relates to the attorney's fees assessed against the Young children. They argue that their tendered evidence demonstrated an arguable basis in fact and law for the Young children's DTPA claims, and, therefore, the trial court should not have assessed attorney's fees against Courtney, Ashley, and Justin.

---

[13]*See* 11 U.S.C.A. § 348; *see also Harris*, 135 S. Ct. at 1837 (stating that Congress added section 348 to resolve a split among courts "on the disposition of a debtor's undistributed postpetition wages following conversion of a proceeding from Chapter 13 to Chapter 7" and that under the section, "in a case converted from Chapter 13, a debtor's postpetition earnings and acquisitions do not become part of the new Chapter 7 estate"); *In re Stamm*, 222 F.3d 216, 218 (5th Cir. 2000) (stating that bankruptcy courts deciding the issue had "uniformly agreed that Section 348(f)(1)(A) establishes that property acquired after the Chapter 13 filing and before discharge under Chapter 7 is not part of the converted estate" and that "[t]here is *no* authority, *from any court*, to support the contrary position" (emphasis added)).

Starn requested fees against the Young children under section 17.50 of the DTPA[14] and as sanctions under civil procedure rules 13 and 215.[15] Starn's attorney argued to the trial court that the Young children filed their claims not because they believed they had legitimate claims but because they "decide[d] to get entrepreneurial with the litigation." He stated that he did not "explore negligence and the underlying factual basis of these, because it became very suspicious from the very beginning," and "there were never any depositions taken or things like that" because he saw such discovery as a waste of his client's resources. Thus, he said, had the children not filed DTPA claims, Starn would not have any basis on which to seek attorney's fees against them. Accordingly, Starn based its request for attorney's fees on only the assertion of the DTPA claims. Starn had also requested an award of attorney's fees against the Youngs' attorney on the same grounds.[16] The trial court awarded the requested fees against the Young children under DTPA section 17.50 but declined to award any fees against their attorney.

---

[14] *See* Tex. Bus. & Com. Code Ann. § 17.50(c) (West 2011) (providing that if a court finds than an action under that section was groundless in fact or law or brought in bad faith, or brought for the purpose of harassment, the court shall award reasonable and necessary attorney's fees to the defendant).

[15] Tex. R. Civ. P. 13, 215.

[16] *See Nath v. Texas Children's Hosp.*, 446 S.W.3d 355, 367 (Tex. 2014) (discussing when an attorney shares the blame with the client for sanctionable conduct).

Appellate court review of a trial court's groundlessness determination "is a question of law under an abuse of discretion standard."[17] The term "groundless" for DTPA purposes has the same meaning as it does under civil procedure rule 13: "[N]o basis in law or fact *and* not warranted by good faith argument for the extension, modification, or reversal of existing law."[18]

The test for groundlessness under the DTPA is "whether the totality of the tendered evidence demonstrates an arguable basis in fact and law for the consumer's claim."[19] However, "groundless" under the DTPA is not synonymous with "no evidence."[20] "To equate groundlessness with no evidence would preclude the award of attorneys' fees in obviously fraudulent or malicious actions when some evidence was presented, yet discourage legitimately wronged consumers from seeking the protections afforded by the Act for fear of failure in court."[21] Accordingly, in determining whether an arguable basis exists for the suit, a court may consider "[e]ven evidence that is legally inadmissible or subject to other defects . . . provided there is some good faith basis for belief that the

---

[17] *Donwerth v. Preston II Chrysler-Dodge, Inc.*, 775 S.W.2d 634, 637 n.3 (Tex. 1989).

[18] *Id.* at 637 (quoting civil procedure rule 13) (quotation marks omitted) (emphasis added).

[19] *Splettstosser v. Myer*, 779 S.W.2d 806, 808 (Tex. 1989).

[20] *Donwerth*, 775 S.W.2d at 637.

[21] *Id.*

tendered evidence might be admissible or that it could reasonably lead to the discovery of admissible evidence."[22]

To prevail on their DTPA claims, the Young children needed to show that they were consumers and that they suffered damages, the producing cause of which was one of the following statutory grounds:

(1) the use or employment of a false, misleading or deceptive act or practice that is a specifically enumerated violation under DTPA section 17.46(b) and on which they detrimentally relied;

(2) a breach of an express or implied warranty;

(3) any unconscionable action or course of action; or

(4) the use of an act or practice that violates chapter 541 of the insurance code.[23]

"Unconscionable action or course of action" is defined in the DTPA to mean "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."[24]  "[N]o specific representations need be required in order to maintain a DTPA suit for unconscionable conduct."[25]

---

[22] *Id.*

[23] Tex. Bus. & Com. Code Ann. § 17.50(a).

[24] *Id.* § 17.45(5) (West 2011).

[25] *Wheeler v. Yettie Kersting Mem'l Hosp.*, 866 S.W.2d 32, 49 (Tex. App.—Houston [1st Dist.] 1993, no writ).

<u>The totality of the evidence provided an arguable basis for concluding that Starn's improper installation caused damages to the Young children</u>

In the trial court, the Youngs provided as summary judgment evidence the affidavit of Roger Davidson, who holds a Class A Air-Conditioning Contractors license and has served as a plumbing and mechanical inspector for the City of Dallas for more than twenty-seven years. Davidson explained that the type of cooling equipment used in the Youngs' home must be connected to a trapped condensate drain pipe, or else "the fan will create a negative pressure inside the coil cabinet which causes air to be drawn into the inside of the enclosure which prevents the water from draining into the condensate drain line," causing water to spill out.

Davidson stated that in the Youngs' system, the necessary trap had been installed with the condensation drain pipe, but "a tee fitting was installed between the trap and the air handler." That tee fitting "allowed air to be pulled back into the inside of the coil cabinet[,] which prevented water from draining out through the condensate drain pipe." Davidson stated that this tee "effectively eliminated the trap." He further stated that the incorrectly connected drain caused the condensate to spill into the attic and the home below.

The Youngs also included the invoice from Ohlen-Air on which the service provider stated that he had "found drain not drain[ing] properly" and "found tee on drain [illegible] p-trap and switched on Air Handler." The Youngs further included pictures of the tee fitting installed on their system.

14

The Youngs also produced the report of Parish in which he stated that he had found mold in the home. Parish explained the repair work that would have to be done on the home to remove the mold and that clothing would need to be properly treated as well. The children stated in affidavits that they had to move from the home because of the presence of the mold. Regardless of whether this evidence was ultimately admissible at trial or whether the Young children could have ultimately met their burden of proof,[26] it was evidence that provided an arguable basis in fact that Starn had improperly installed the air conditioning system, that this improper installation caused water to drain into the Youngs' home, that mold developed in their home, and that they suffered damages as a result.

However, the improper performance of services does not alone give rise to a DTPA claim. We therefore consider whether, accepting that the Young children had an arguable basis for claiming that Starn's performance of services resulted in damages, they had an arguable basis for asserting DTPA claims.[27]

<u>The Young children's claims were not groundless on the basis that they were not consumers</u>

To be a consumer for purposes of the DTPA, a person must have sought or acquired goods or services, and those same goods or services must form the

---

[26] *See Donwerth*, 775 S.W.2d at 637.

[27] *Id.*

15

basis of the complaint.[28]  Starn argued to the trial court that the Young children were not consumers because they did not buy the house and were adults when the suit was filed.  The trial court agreed and found that the Young children were not consumers of Starn's services.

Wanda and Tommie bought a new-construction home that Starn improved with an air conditioning system.  That service formed the basis of the Youngs' complaints against Starn.  They are therefore consumers under the DTPA.[29]

At the time the Youngs filed suit, Justin was eighteen years old, Ashley was twenty, and Courtney was almost twenty-five.  At the time that their parents bought the home, however, Justin and Ashley were minors, and Courtney was only just nineteen and was still living at home.  Wanda and Tommy bought the home for the benefit of the entire family, to provide a home for themselves and their children.  As Wanda and Tommie are consumers under the DTPA, so are their children.[30]

---

[28] *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex. 1981).

[29] *See Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 650 (Tex. 1996) ("[T]he homeowners purchased homes equipped with polybutylene plumbing systems.  These systems are goods, and they form the basis of the homeowners' complaints.  The homeowners are therefore consumers under the DTPA.").

[30] *See Angeles v. Brownsville Valley Reg'l Med. Ctr., Inc.*, 960 S.W.2d 854, 859 (Tex. App.—Corpus Christi 1997, pet. denied) (stating that to be a "consumer" under the DTPA, a person need not be the actual purchaser of the goods or services, "as long as the consumer is the beneficiary of those goods or services").

<u>The record does not show a basis for DTPA claims against Starn based on misrepresentations or unconscionable acts</u>

In *Amstadt v. U.S. Brass Corporation*, a group of homeowners brought negligence and DTPA claims against the manufacturers of equipment that had been installed in their homes.[31] The Supreme Court of Texas held that the homeowners could recover under a negligence theory but not under the DTPA.[32] In reaching its holding, the court pointed out that for a consumer to have a valid DTPA claim based on a misrepresentation, the alleged representation has to be made in connection with the consumer's transaction.[33] Thus, the court held, upstream manufacturers and suppliers of goods are not liable to consumers under the DTPA for misrepresentations they have made to third parties when those representations have not been communicated to the consumer or have no connection to the consumer transaction.[34]

The *Amstadt* court stated that the purpose of the DTPA is "to protect consumers in consumer transactions" and that its holding that "the defendant's deceptive conduct must occur in connection with a consumer transaction" was consistent with that intent.[35] Likewise, for claims based on an unconscionable

---

[31] *Amstadt*, 919 S.W.2d at 647.

[32] *Id.*

[33] *Id.* at 650.

[34] *Id.* at 649.

[35] *Id.*

17

act, the defendant's taking advantage of another's lack of knowledge, ability, experience, or capacity must have been done in connection with the consumer transaction giving rise to the claim.[36]

The Youngs were not suing the maker of the air conditioning unit or the maker of other parts of the HVAC system. Instead, the Youngs sued the company that put that unit in the house they bought to live in. The installation of a central heating or cooling unit in a home can give rise to a DTPA claim.[37] And reasonable homebuyers in Texas generally will not knowingly purchase a newly-built home with an improperly-installed air conditioning system, or at least they will not do so and also knowingly pay the same price for the home as they would pay for one with a properly-installed unit.[38]

But for a valid DTPA claim against Starn, the Young children needed more than the fact that under normal circumstances, a subcontractor should know that

---

[36]*Id.* at 652 (requiring a connection with the consumer transaction both for allegations based on misrepresentations and for those based on unconscionable acts).

[37]*See Hurst v. Sears, Roebuck & Co.*, 647 S.W.2d 249, 252–53 (Tex. 1983) (superseded by statute on other grounds) (reviewing a claim brought under prior version of DTPA for damage to a home from the improper installation of a central heating and cooling system and holding that the jury's finding that the installer's failure to obtain an inspection and permit were producing causes of the consumer's damages was sufficient to satisfy the statute's then-requirement that the plaintiff be adversely affected by the defendant's conduct).

[38]*See Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 594 (Tex. 1999) (stating in a product defect case that "[p]ublic policy favors reasonable conduct by consumers" and that consumers have a responsibility to act reasonably).

the home buyer expects work to be done properly.[39] The Young children had no DTPA claim against Starn based on misrepresentations or unconscionable acts unless misrepresentations or unconscionable acts actually occurred and unless those acts had a connection to the transaction.[40] The connection could be demonstrated by showing that Starn had a contractual relationship with the Youngs, that Starn made a misrepresentation to them or a misrepresentation to Pulte that was communicated to them; that Starn did an unconscionable act that had a connection with the transaction between Pulte and the Youngs, or that Starn received a benefit from a transaction between Pulte and the Youngs.[41]

Nothing in the record indicates on what factual basis the Youngs had concluded that Starn had made misrepresentations or engaged in unconscionable acts. There is no evidence in the record of misrepresentations or unconscionable acts by Starn.[42] Accordingly, the trial court did not abuse its discretion in concluding that the Young children had no arguable basis in fact for

---

[39] *See Schambacher v. R.E.I. Elec., Inc.*, No. 2-09-345-CV, 2010 WL 3075703, at *4 (Tex. App.—Fort Worth Aug. 5, 2010, no pet.) (mem. op.) (discussing when a homeowner may sue a subcontractor).

[40] *See Amstadt*, 919 S.W.2d at 652.

[41] *See Todd v. Perry Homes*, 156 S.W.3d 919, 922 (Tex. App.—Dallas 2005, no pet.) (stating that when there is no contractual privity between an upstream defendant seller and the consumer, the required connection "can be demonstrated by a representation that reaches the consumer or by a benefit from the second transaction to" the defendant (quotation marks and citation omitted)).

[42] *See Donwerth*, 775 S.W.2d at 637.

asserting DTPA claims based on either unconscionable acts or representations by Starn.

<u>The record does not show grounds for DTPA claims against Starn based on warranties or violations of the insurance code</u>

Chapter 541 of the insurance code has no application to this case,[43] and therefore the Young children could not base a DTPA claim on the violation of that chapter.[44]  That leaves only the breach of a warranty as a possible basis for their asserting DTPA claims.

A consumer may bring a DTPA claim against a defendant for the breach of either an express or implied warranty.[45]  There is nothing in the record showing or even suggesting that Starn had a contract with the Youngs or made an express agreement with them about how the work was to be performed.[46]  Thus, if the Youngs had a DTPA claim against Starn based on the violation of a warranty, it had to be based on an implied warranty.

In the absence of an express warranty, the implied warranties of habitability and of good workmanship apply to new home construction, and an

---

[43]*See* Tex. Ins. Code Ann. § 541.001 (West 2009) (stating that the purpose of the chapter is to regulate trade practices in the insurance business).

[44]*See* Tex. Bus. & Com. Code Ann. § 17.50(a)(4) (providing for a claim for the violation of insurance code chapter 541).

[45]*Id.* § 17.50(a)(2); *see also La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 565 (Tex. 1984) (stating that because the DTPA does not create any warranties, any warranty on which a DTPA claim is based must be established outside of the act).

[46]*See* Tex. Bus. & Com. Code Ann. § 17.50(a)(2).

20

implied warranty of good and workmanlike repair or modification applies to repairs and modifications of property.[47] The Young children alleged that Starn had breached the warranties of providing services in a good and workmanlike manner and of fitness for a particular purpose.[48]

"Implied warranties are created by operation of law and are grounded more in tort than in contract,"[49] and "[a]n implied warranty arises by operation of law when public policy so mandates."[50] In *Humber v. Morton*, the Supreme Court of Texas discussed implied warranties in new home construction, holding that the doctrine of caveat emptor does not apply.[51] It quoted the Idaho Supreme Court, stating that "[t]he purchase of a home is not an everyday transaction for the average family, and in many instances is the most important transaction of a lifetime," and "[t]o apply the rule of caveat emptor to an inexperienced buyer, and

---

[47] *Gonzales v. Sw. Olshan Found. Repair Co., LLC*, 400 S.W.3d 52, 56, 59 (Tex. 2013).

[48] *But see McDonald v. City of the Colony*, No. 2-08-00263-CV, 2009 WL 1815648, at *13 (Tex. App.—Fort Worth June 25, 2009, no pet.) (mem. op.) (stating that "[t]he implied warranty of fitness for a particular purpose is created under the Texas Business and Commerce Code and applies only to goods" and that the implied warranty of habitability applies to residential property).

[49] *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 352 (Tex. 1987) (op. on reh'g).

[50] *Id.* at 353.

[51] 426 S.W.2d 554, 561 (Tex. 1968).

in favor of a builder who is daily engaged in the business of building and selling houses, is manifestly a denial of justice."[52]

The *Humber* court stated, "Obviously, the ordinary purchaser is not in a position to ascertain when there is a defect in a chimney flue, or vent of a heating apparatus, or whether the plumbing work covered by a concrete slab foundation is faulty."[53]  The court held that "[t]he caveat emptor rule as applied to new houses is an anachronism patently out of harmony with modern home buying practices," and "[i]t does a disservice not only to the ordinary prudent purchaser but to the industry itself by lending encouragement to the unscrupulous, fly-by-night operator and purveyor of shoddy work."[54]

In *Melody Home Manufacturing Company*, the Supreme Court of Texas considered "whether the protection of Texas consumers requires the utilization of an implied warranty that repair services of existing tangible goods or property will be performed in a good and workmanlike manner as a matter of public policy."[55] In that case, Melody Home had delivered a prefabricated home to the plaintiffs, who subsequently discovered that a sink was not connected to the drain in one of the interior walls, causing severe damage to the home.[56]  Melody Home twice

---

[52] *Id.*

[53] *Id.*

[54] *Id.* at 562.

[55] 741 S.W.2d at 353.

[56] *Id.* at 351.

sent workers to repair the problem, but the workers did not fix the problem and in fact caused additional damage.[57]  The plaintiffs then filed a DTPA suit against Melody Home based on implied warranties.[58]

In reaching its holding, the court reasoned that "the public interest in protecting consumers from inferior services is paramount to any monetary damages imposed upon sellers who breach an implied warranty," that "a service provider is in a much better position to prevent loss than is the consumer of the service," that "a consumer should be able to rely upon the expertise of the service provider," and that "a service provider is better able to absorb the cost of damages associated with inferior services through insurance and price manipulation than is the individual consumer."[59]  The court concluded that a caveat emptor rule for services "does a disservice not only to the ordinary prudent purchaser but to the industry itself by encouraging the purveyor of shoddy workmanship."[60]  For those reasons, the court concluded that "an implied warranty to repair or modify existing tangible goods or property in a good and workmanlike manner is available to consumers suing under the DTPA."[61]

---

[57] *Id.*

[58] *Id.*

[59] *Id.* at 353–54.

[60] *Id.*

[61] *Id.*

The court made two further holdings in that case. First, the court held that expert testimony was not required because "the breach of the implied warranty was plainly within the common knowledge of laymen"; "[t]he jurors had sufficient knowledge to find that the failure to connect a washing machine drain would not be considered good and workmanlike by those capable of judging repair work."[62] Second, the court held that the implied warranty may not be waived or disclaimed.[63] That court later modified that second holding, stating that "[a]lthough the parties cannot disclaim this [implied] warranty outright," an express warranty may supersede it.[64]

From *Humber* and *Melody Home*, the public policy in this state is to put the responsibility of preventing shoddy work on the provider of the work rather than the consumer and to protect the consumer from bearing that burden. Accordingly, if Starn failed to install the air conditioning system in a good and workmanlike manner, the public policy of the state would appear to favor holding Starn responsible for the damages that resulted to the Youngs' property. However, this policy does not exist in a legal vacuum, and other factors ultimately prevented the Young children's claims from being viable.

Neither *Humber* nor *Melody Home* involved DTPA claims against a subcontractor, as this case does. The Supreme Court of Texas discussed

---

[62] *Id.* at 355.

[63] *Id.*

[64] *Gonzales*, 400 S.W.3d at 59.

24

implied warranties in the context of DTPA claims against remote sellers in *PPG Industries*.[65]  *PPG* cited *Amstadt* and stated that a downstream buyer can sue a remote (upstream) seller for a breach of an implied warranty, but not under the DTPA.[66]

Starn is a services provider that improved the Youngs' home with an HVAC system, not an upstream seller of goods to a contractor building a house. But *PPG* is still relevant because it stated that the required connection to a transaction discussed in *Amstadt* applies equally to DTPA claims based on a breach of an implied warranty.[67]  And the purpose of the DTPA is not simply to protect plaintiffs from injury from the use of products and services, but to specifically protect consumers engaging in transactions, as stated in *Amstadt*.[68] Thus, for the same reason that an upstream seller must have a connection to the transaction to have DTPA liability, so must a subcontractor.  And even outside the DTPA context, Texas law generally does not allow claims against subcontractors absent a contractual relationship or other special circumstance.[69]

---

[65] *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 89 (Tex. 2004).

[66] *Id.*

[67] *Id.*

[68] *See Amstadt*, 919 S.W.2d at 649–50.

[69] *See Thomson v. Espey Huston & Assoc., Inc.*, 899 S.W.2d 415, 419 (Tex. App.—Austin 1995, no writ) ("The contract between the property owner and the general contractor gives the property owner the right to a finished

As we have said, there is no evidence in the record, admissible or otherwise, that Starn had a contract with the Youngs. There is also no evidence that Starn received a benefit, not only from its subcontract with Pulte, but also from the transaction between the Youngs and Pulte. There is no evidence of a connection between Starn and the transaction that would support a DTPA claim based on an implied warranty.

Nevertheless, the Young children's claims were not groundless. In the past, we have suggested that the door was not entirely and firmly shut on claims against subcontractors. In *Thomas v. Atlas Foundation Company, Inc.*, we suggested that in some cases, a subcontractor could have an obligation to a consumer through an implied warranty.[70] Specifically, we stated in dicta that Atlas, the subcontractor, by agreeing to build a porch, "impliedly warranted that all such work would be done in a good and workmanlike manner."[71] We further stated, however, that the mere breach of an implied warranty would not give rise to a DTPA claim; "[w]e deem[ed] more to be required."[72] But, though not necessary for the disposition in the case, we stated that under some

___

building . . . . If the subcontractors' performance falls short of what the owner is entitled to, it is the general contractor who has to make up the difference.").

[70]609 S.W.2d 302, 303 (Tex. Civ. App.—Fort Worth 1980, writ ref'd n.r.e.).

[71]*Id.*

[72]*Id.* at 304.

26

circumstances, a subcontractor could be liable under the DTPA for the breach of an implied warranty.[73]

Then in *Rayon*,[74] a non-DTPA case, this court stated without discussion that an implied warranty claim against a subcontractor is barred as a matter of law. *Rayon* did not mention *Thomas*. We reiterated *Rayon*'s holding in *Irwin* and *Glenn*, neither of which mentioned *Thomas*.[75] In *Glenn*, this court declined to carve out an exception to the rule as stated in *Rayon*, holding that such an exception would have given the plaintiff in that case a double recovery from both the builder and the subcontractor.[76] Thus, *Glenn* could be read as impliedly suggesting that in some cases, when double recovery is not an option, an exception could be had.

In *Irwin*, we again held that the subcontractor could not be liable under an implied warranty because the plaintiff had other adequate remedies to redress the wrongs committed—specifically, a settlement with their insurer—and the plaintiffs had "no compelling need that justifie[d] imposing an implied warranty in this case in light of their settlement with [their insurer], an entity with whom

---

[73] *See id.* at 303–04.

[74] *Rayon v. Energy Specialties, Inc.*, 121 S.W.3d 7, 21 (Tex. App.—Fort Worth 2002, no pet.).

[75] *Irwin v. Nortex Found. Designs, Inc.*, No. 2-08-00436-CV, 2009 WL 2462566, at *3 (Tex. App.—Fort Worth Aug. 13, 2009, no pet.) (mem. op.); *Glenn v. Nortex Found. Designs, Inc.*, No. 2-07-00172-CV, 2008 WL 2078510, at *3 (Tex. App.—Fort Worth May 15, 2008, no pet.) (mem. op).

[76] *Glenn*, 2008 WL 2078510, at *3.

Appellants had a contract."[77]   *Irwin* thus also could be read as impliedly suggested that in some narrow circumstances, when the plaintiff has shown a "compelling need," an implied warranty claim could be brought against a subcontractor.   Similarly, in *Codner v. Arellano*, the Austin Court of Appeals stated that because the homeowner could sue its general contractor (but instead chose to settle those claims) and thus "had adequate remedies to redress the wrongs he allege[d] were committed" by the subcontractor, there was no compelling public policy reason to impose an implied warranty against a defendant subcontractor.[78]  Such language could be read to suggest that in some cases, public policy would produce a different result.

Starn is correct that this court has held that a plaintiff homebuyer has no claim against a subcontractor for a breach of an implied warranty, and this remains the general rule.  If there is some other special circumstance under which public policy would support an implied warranty claim against a subcontractor, it is not present in a case such as this, nor in any of the cases we have considered since *Thomas*, and we decline to speculate what that circumstance might be.

To be clear, we continue to hold that a subcontractor will generally not be liable to a homeowner for poor workmanship, under the DTPA or otherwise, unless the subcontractor has a contractual relationship with the owner.  In the

---

[77] *Irwin*, 2009 WL 2462566, at *3.

[78] 40 S.W.3d 666, 673–74 (Tex. App.—Austin 2001, no pet.).

context of the DTPA, a sufficient connection to the transaction at issue may support liability.[79]  Without that connection, however, the plaintiff has no DTPA claim against the subcontractor.[80]  A homeowner's claim for breach of an implied warranty in the home's construction will generally be against the contractor, not the subcontractor.[81]

But the Young children are correct that this court has included language in its opinions that could be read to suggest that this rule is not absolute, and in some cases there could be a public policy reason to impose an implied warranty against a subcontractor.  For DTPA purposes, the fact that a subcontractor worked on the construction of a new home gives the subcontractor a greater connection to the purchase of that home than that of the defendants in *Amstadt*; Starn's services went toward completion of the construction of the home that was the subject of the transaction.  Given that there was no evidence that the Youngs or even Starn knew that Starn would perform services on the house at the time the contract was made, that connection is not, by itself, the kind of connection that will support a DTPA claim.

---

[79]*See, e.g.*, *Todd*, 156 S.W.3d at 922 (reciting the types of connections to a transaction on which DTPA liability may be based).

[80]*Cf. Raymond v. Rahme*, 78 S.W.3d 552, 563 (Tex. App.—Austin 2002, no pet.) (holding that the evidence did not support the trial court's finding of an implied warranty against the subcontractor when there was no direct contractual relationship with the owner).

[81]*See Thomson*, 899 S.W.2d at 419.

But given our prior suggestion that subcontractors owe homebuyers implied warranties, our prior suggestion that the need to make a plaintiff whole could support a subcontractor being held liable under an implied warranty, and the specific facts and evidence in this case, the Young children's claims made a good faith argument for an extension, modification, or reversal of existing law, and we hold that their claims were not groundless.[82]  We sustain the Young's second issue.

In the Youngs' third issue, they ask alternatively if conditional appellate fees were authorized based solely on a finding in the trial court that the claims were "groundless;" and, if so, whether the award was supported by sufficient evidence.  Because we have held that attorney's fees should not have been awarded to Starn, we need not address this issue.

## Conclusion

Having sustained the Youngs' first two issues, which are dispositive, we reverse the trial court's judgment dismissing Wanda and Tommie's claims and awarding attorney's fees to Starn for the claims brought by Courtney, Ashley, and Justin, and we remand Wanda and Tommie's claims to the trial court.

---

[82] *See Donwerth*, 775 S.W.2d at 637.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MEIER, JJ.

MEIER, J., concurs without opinion.

DELIVERED:  August 26, 2016